**PACIFIC EMPLOYERS INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**DOMINO'S PIZZA, INC., Defendant–Appellant.**

Nos. 96–56858, 97–55178.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 1998.

Decided June 4, 1998.

Amended July 6, 1998.

Kirk A. Pasich, Amy Kincaid Berry, and Cassandra C. Shivers, Troop Meisinger Steuber & Pasich, LLP, Los Angeles, California, for the appellant.

Robert C. Chiles, Marsha L. Morrow, and John H. Quinn, Long & Levit LLP, San Francisco, California, for the appellee.

Before: FLETCHER, MAGILL,* and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

Domino's Pizza, Incorporated, appeals the district court's grant of summary judgment in favor of Pacific Employers Insurance Company ("PEIC") on the question of the allocation of the cost of settling a lawsuit. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

---

* Honorable Frank J. Magill, Senior United States Circuit Judge for the Eighth Circuit Court of

## I.

### A. *The Underlying Action*

A Domino's employee, Joseph Duran, while driving his personal vehicle on his way home from work, fell asleep at the wheel and caused an accident in which one person was killed and another was severely injured. Two lawsuits were filed against Domino's on behalf of the victims ("underlying lawsuits"), alleging that Domino's coerced and compelled Duran to work thirty-one out of the previous thirty-six hours, knowing that Duran would need to drive sixty miles home on the freeway after leaving work, and that Domino's should have foreseen that such excessively long work hours would impair Duran's ability to safely operate a motor vehicle and create a substantial risk of harm to others using the public roadways. Domino's, through its comprehensive general liability insurers, settled the underlying lawsuits for $11.5 million.

### B. *The Insurance Policies*

At the time of the accident, Domino's was covered by the following insurance policies:

1. *Comprehensive General Liability ("CGL") Policies:*

a. *Zurich–American Insurance Group ("Zurich"):* a policy providing $1 million in CGL coverage ("Zurich CGL policy"). This is a "fronting policy" under which Domino's is required to pay all indemnity and defense obligations for losses covered by the policy.

b. *United States Fire Insurance Company ("USF"):* an umbrella policy providing $5 million in coverage in excess of the coverage provided by the "underlying insurance." The "underlying insurance" for CGL coverage is identified as the $1 million Zurich CGL policy.

c. *PEIC:* an umbrella policy providing $15 million in coverage in excess of the $5 million coverage provided by the "underlying insurance," which is identified as the USF policy.

---

Appeals, sitting by designation.

Domino's CGL coverage can be summarized as follows:

| CGL Policy | CGL Total Coverage |
|---|---|
| Zurich CGL-$1 million | $ 1 million |
| USF-$5 million | $ 6 million |
| PEIC-$15 million | $21 million |

2. *Automobile Liability Policies:*

a. *Zurich:* a policy providing $1 million of automobile liability coverage ("Zurich BAP policy"). This is a "fronting policy" under which Domino's is required to pay all indemnity and defense obligations for losses covered by the policy.

b. *Home Insurance Company ("Home"):* a policy providing $1 million of automobile liability coverage in excess of the $2 million coverage provided by the "underlying insurance." It is uncontroverted that the $2 million "underlying insurance" consists of the $1 million Zurich BAP policy and a $1 million Domino's self-insured retention.

c. *USF:* the same umbrella policy described above providing $5 million in coverage in excess of the coverage provided by the "underlying insurance." The "underlying insurance" for nonowned automobile liability coverage is defined as the self-insured retention ($1 million), the Zurich policy ($1 million) and the Home policy ($1 million).

d. *PEIC:* the same umbrella policy described above providing $15 million in coverage in excess of the coverage provided by the "underlying insurance," which is defined as the USF policy.

Domino's automobile liability coverage can be summarized as follows:

| Automobile Liability Policy | Total Coverage |
|---|---|
| Zurich BAP-$1 million | $ 1 million |
| Domino's self-insured retention-$1 million | $ 2 million |
| Home-$1 million | $ 3 million |
| USF-$5 million | $ 8 million |
| PEIC-$15 million | $23 million |

C. *The Present Action*

The $11.5 million settlement was paid as follows: Domino's paid $1 million through the fronted Zurich CGL policy; USF paid $5 million under its CGL policy; and PEIC paid the remaining $5.5 million under its CGL policy. PEIC then filed the present action for declaratory relief, indemnity, contribution and equitable subrogation in federal district court. In this action, PEIC sought additional contribution from Domino's and Home. There was no controversy regarding the $5 million payment by USF.

The district court granted summary judgment in favor of PEIC, holding that the automobile liability line of insurance was triggered by the accident. The court therefore required Home to contribute $1 million toward the settlement and Domino's to contribute an additional $1 million to account for the self-insured retention. The resulting allocation is as follows: Domino's via the Zurich BAP policy-$1 million; Domino's via the self-insured retention-$1 million; Home-$1 million; USF-$5 million; and PEIC-$3.5 million. Domino's timely appeals from the district court's grant of summary judgment.[1]

## II.

A. *Jurisdiction Over Declaratory Relief Action*

Domino's argues that the district court erred by failing to consider the abstention doctrine before exercising jurisdiction over this declaratory relief action. We disagree.

There is no evidence that Domino's ever raised the abstention issue before the district court, or that the district court considered abstaining from the case. Furthermore, it is undisputed that the district court had both constitutional and statutory jurisdiction to hear this declaratory judgment action. The district court could therefore "entertain the action without, *sua sponte* addressing whether jurisdiction should be declined." *Government Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1224–25 (9th Cir.1998).

B. *Grant of Summary Judgment*

We review the district court's grant of summary judgment *de novo. Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 559, 139

---

1. Home's appeal from the district court's order, No. 96–56856, has been dismissed pursuant to the stipulation of the parties.

L.Ed.2d 401 (1997). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.·*

Domino's argues that the district court erred in holding that the automobile liability line of insurance was triggered by the underlying accident. Specifically, Domino's argues that its liability flowed from a loss covered by its CGL policies, not by its automobile policies. PEIC argues that the loss *was* covered by the automobile policies and that Domino's was therefore required to contribute an additional $1 million (for the self-insured retention) to exhaust the "underlying insurance" as required under the PEIC policy. To resolve this dispute, we will examine each of the automobile liability policies, beginning with the Zurich BAP policy.

### 1. *Zurich BAP Policy*

The Zurich BAP policy provides that Zurich will pay all sums Domino's is legally required to pay "caused by an 'accident'" and resulting from the "ownership, maintenance or use of a covered 'auto.'" For liability purposes, a "covered auto" is designated as the symbol "1," which is defined in the policy as "any 'auto.'" Therefore, under the plain terms of the policy, the policy covers Domino's liability arising out of an accident and resulting from the "use of" "any auto."

#### a. *"Use Of"*

■ Domino's argues that the words "use of" in the Zurich BAP policy must mean "use of" an auto by Domino's. We disagree.

"California cases have established beyond contention that this language of 'arising out of the use [of a covered automobile],' when utilized in a coverage or insuring clause of an insurance policy, has broad and comprehensive application, and affords coverage for injuries bearing almost any causal relation with the vehicle." *State Farm Mut. Auto. Ins. Co. v. Partridge,* 10 Cal.3d 94, 109 Cal.Rptr. 811, 815, 514 P.2d 123, 127 (1973). In fact, California courts have interpreted the term "use of" to include "any activity in utilizing the [covered] vehicle in the manner intended or contemplated by the insured." *State Farm Fire & Cas. Co. v. Camara,* 63 Cal.

App.3d 48, 133 Cal.Rptr. 600, 603 (1976) (quoting *Pacific Indem. Co. v. Truck Ins. Exch.,* 270 Cal.App.2d 700, 76 Cal.Rptr. 281, 283 (1969)). Applying this standard to the present case, we conclude that the use of the vehicle by Duran, driving on a highway on his way home from work, was an activity "utilizing the covered vehicle in the manner contemplated" by Domino's. *See id.* The injuries resulting from the accident unquestionably bear a causal relationship to use of the vehicle: the accident was caused by Duran's falling asleep at the wheel of the vehicle while driving it on the highway. *See Partridge,* 109 Cal.Rptr. at 815, 514 P.2d at 127. The "use of" requirement of the Zurich BAP policy was therefore met.

This conclusion is supported by the terms of the policy itself, which make it clear that when the policy writers intended to limit coverage to those vehicles being used in connection with Domino's business, they made that limit explicit. Of the various options for designation of covered autos in the Zurich BAP policy, one of the options is for nonowned autos. Under this option, nonowned autos are covered only if used in connection with Domino's business. In contrast, the options that deal with autos owned, leased, hired, rented or borrowed by Domino's do not have a designation that the autos are covered only if the "use" is in connection with Domino's business; under these options, autos owned, leased, hired, rented or borrowed by Domino's would be covered by the policy regardless of whether their use was in connection with Domino's business or not. Similarly, because the "any auto" option chosen by Domino's does not contain any limit on the "use" of the autos, *any* use of "any auto," which results in an accident and resulting liability on the part of Domino's, is covered.

#### b. *"Any Auto"*

■ Domino's also argues that Duran's auto does not fall within the "any auto" category within the meaning of the policy and was not, therefore, a "covered auto." We disagree.

The only published California case to address the meaning of the "any auto" language in an automobile liability policy is

*Travelers Indem. Co. v. Swearinger,* 169 Cal. App.3d 779, 214 Cal.Rptr. 383 (1985). In that case, a high school student's family was acting as a "host" family for visiting students participating in a basketball tournament at Fall River High. Host families were responsible for lodging, feeding and transporting the visiting students over the several days that the tournament lasted. Two of the visiting students were being transported from the tournament to the host family's home in the family car when an accident occurred. The host family's daughter, also a high school student, was driving the car at the time of the accident. One of the visiting students was injured in the accident and sought recovery for the injuries suffered in the accident from, among others, Fall River School District.

Fall River's insurer, Travelers Insurance Company, brought a declaratory judgment action, seeking a declaration that its policy did not provide any liability or other coverage for the injuries arising out of the accident. *Id.* 214 Cal.Rptr. at 384. The Travelers' insurance policy provided that Travelers would "pay all sums the insured legally must pay as damages because of bodily injury or property damage to which the policy applies, caused by an accident and resulting from the ... use of a covered auto." *Id.* at 384–85. The policy defined nine classes of covered autos, only one of which was made applicable by the endorsements-the "any auto" class. *Id.* at 385. The court held that the host family's vehicle, as an "auto," fell within the class of covered autos. *Id.* The court then went on to determine whether the daughter, who was driving the auto, was an "insured" within the meaning of the policy. *Id.*

We recognize that we are not bound by the California Court of Appeal's interpretation of this language. We believe, however, that the California Supreme Court would follow the path set out by the *Swearinger* court and give the "any auto" language a broad interpretation. We therefore hold that the Duran vehicle, as an "auto," fell within the "any auto" category and was thus a "covered auto" under the Zurich BAP policy. *See id.; see also Fay v. Willis,* 545 So.2d 1296, 1297–99 (La.Ct.App.1989).

### 2. Home Policy

■ The Home policy provides $1 million excess automobile liability coverage. The Home policy specifies that, unless otherwise stated in the policy, it is "subject to all conditions, agreements and limitations of the Underlying Insurance and shall follow the Underlying Insurance ... in all respects, including changes in the Underlying Insurance by endorsement." The policy identifies the "underlying insurance" as the Zurich BAP policy for $1 million and Domino's self-insured retention of $1 million.

Because we hold that the Zurich BAP policy was triggered, it follows that the Home policy, which explicitly states that it "is subject to all conditions, agreements and limitations of the [Zurich BAP policy] and ... follow[s] the [Zurich BAP policy] in all respects," was also triggered.

### 3. USF Policy

The USF policy provides that it will pay those sums the insured becomes legally obligated to pay as damages arising out of an occurrence which are in excess of the "underlying insurance." The policy defines "underlying insurance" for the nonowned automobile liability coverage as a $1 million Home policy, a $1 million Zurich policy and a $1 million self-insured retention; and the "underlying insurance" for the CGL coverage as the $1 million Zurich CGL policy.

■ It is undisputed that the USF policy was triggered, that USF has paid its policy limit of $5 million and has therefore fulfilled its obligations under its policy. The only question we must answer in regards to the USF policy is which USF coverage was triggered-the USF CGL coverage or the USF nonowned automobile liability coverage. Because we have held that the Zurich BAP policy (and hence the Home policy) was triggered, we must also find that the USF nonowned automobile coverage, which follows the Home and Zurich BAP policies, was triggered.

### 4. PEIC Policy

■ The PEIC policy provides $15 million in excess coverage above the $5 million pri-

mary umbrella liability insurance. The policy identifies the $5 million primary umbrella liability insurance as the USF policy, and provides that the PEIC policy "shall follow the primary insurance," unless specifically provided otherwise. Because we have held that the Zurich BAP, the Home and the USF policies were triggered, it necessarily follows that the PEIC policy was triggered.

Furthermore, because the PEIC policy "follows" the USF policy, the USF policy's provision that its insurance is excess to all underlying and other collectible insurance available to the insured that covers the loss, is also a provision of the PEIC policy. Before the PEIC policy is actually triggered, Domino's must exhaust all *underlying and other collectible insurance.* This means that the Zurich BAP policy ($1 million), the self-insured retention ($1 million), the Home policy ($1 million) and the USF policy ($5 million) must all be exhausted before the PEIC policy comes into play. Because the underlying insurance adds up to $8 million, PEIC was only liable for the difference between the $11.5 million settlement and $8 million, which is $3.5 million.

### 5. *Conclusion*

In conclusion, we hold that the Zurich BAP policy was triggered, and hence the Home policy was triggered, as was Domino's self-insured retention. Home was therefore required to contribute $1 million toward the settlement costs, and Domino's was required to contribute $1 million additional for a total of $2 million ($1 million under the Zurich BAP and $1 million under the self-insured retention). PEIC was liable for only $3.5 million of the settlement.

### C. *Contribution and Treatment of Self-Insured Retention*

Domino's argues that PEIC is precluded from seeking indemnity or contribution from its insured. In support of its argument, Domino's cites *Armstrong World Indus. v. Aetna Cas. & Sur. Co.,* 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690 (1996). Domino's reliance on this case is misplaced.

In *Armstrong,* the court was faced with the issue of how to apportion a loss from continuing injury due to asbestos exposure. *Id.* 52 Cal.Rptr.2d at 710. During some of the time periods at issue, the insured had either not carried insurance at all or had been self-insured. In this context, the court held that the insurers could not seek to allocate the damage that had occurred during the uninsured or self-insured time periods to the insured. *Id.* at 710–11. Citing to the policy language that required the insurers to pay on behalf of the policyholder "all sums" that the policyholder becomes legally obligated to pay, the court stated:

> We interpret this language to mean that once coverage is triggered, the insurer's obligation to the policyholder is to cover the policyholder's liability "in full" up to the policy limits. It is irrelevant that only part of the asbestosrelated disease developed during any single policy period or during a period in which the manufacturer had no insurance. The logical consequence of this ruling is that the policyholder is covered (up to the policy limits) for the full extent of its liability and need not pay a pro rata share.

*Id.* 52 Cal.Rptr.2d at 711.

In the present case, there is not a continuing loss, nor is there a time period in which damage was incurred and during which Domino's was entirely self-insured or uninsured. Furthermore, the PEIC policy is excess insurance that comes into play only after all underlying insurance is exhausted. Unlike the policy at issue in *Armstrong,* the PEIC policy does not contain a provision that PEIC will pay "all sums" Domino's is legally obligated to pay. Instead, the PEIC policy provides that it will pay those sums Domino's "becomes legally obligated to pay ... which are in *excess* of the underlying insurance...." (Emphasis added.) The rationale behind *Armstrong* is therefore inapplicable.

■ Domino's also argues that its $1 million self-insured retention should not be treated as "underlying insurance" that must be exhausted before the umbrella policies are triggered. This argument lacks merit.

■ It is well recognized that self-insurance retentions are the equivalent to primary liability insurance, and that policies which are subject to self-insured retentions are "excess policies" which have no duty to indemni-

fy until the self-insured retention is exhausted. *See General Star Indem. Co. v. Superior Court,* 47 Cal.App.4th 1586, 55 Cal.Rptr.2d 322, 325 (1996); *Nabisco, Inc. v. Transport Indem. Co.,* 143 Cal.App.3d 831, 192 Cal. Rptr. 207, 209 (1983) ("Transport's coverage is excess over both Nabisco's $50,000 of self-insurance and Home's $5 million umbrella policy."). This means that an excess insurer has no duty to contribute to a settlement on its behalf until all underlying insurance, including any self-insurance, is exhausted. *See Nabisco,* 192 Cal.Rptr. at 209. Applying this rule to the present case, Domino's self-insurance retention was "underlying insurance" that had to be exhausted before PEIC was required to contribute to the settlement.

### D. *Exhaustion of CGL Line of Coverage*

 Domino's argues that even if the automobile line of coverage was triggered, the nonowned automobile liability line of coverage is "excess" insurance over the CGL line and that the entire CGL line must therefore be "exhausted" before the nonowned automobile liability line of coverage is triggered. Domino's further argues that, as the insured, it had the right to choose which line of coverage is triggered by the accident.

Domino's arguments are negated by the plain language of both the USF and the PEIC policies. The CGL and nonowned auto liability coverage provided by USF is contained in a single policy. This policy specifically provides that its policy limits are $5 million *per occurence,* and that it will pay "only the amount of the 'Net Final Loss' that is in excess of ... [t]he total applicable limits of the underlying policies listed in Schedule A hereof, *and any other collectible insurance.*" (Emphasis added.) It also provides:

> If there is any other collectible insurance available to the "insured" that covers a loss that is also covered by this policy, the insurance provided by this policy will apply in excess of other collectible insurance. But this does not apply to insurance purchased specifically to apply in excess of this policy.

Schedule A of the USF policy lists the following underlying insurance:

*Nonowned Automobile Liability:*

—Home for $1 million each occurrence

—Zurich BAP for $1 million each occurrence

—Self–Insured Retention for $1 million each occurrence

*Comprehensive General Liability:*

—Zurich CGL for $1 million each occurrence

The PEIC umbrella policy provides $15 million umbrella coverage *per occurrence.* It specifically provides that the coverage is excess over and "follows" the coverage provided by the USF policy. The PEIC policy is therefore subject to all of the conditions set out in the USF policy and is not triggered until the coverage provided by the underlying insurance listed in the USF policy, the coverage provided by any other applicable insurance and the coverage provided by the USF policy itself are all exhausted.

If we assume that the liability arising out of the automobile accident was covered by both the CGL line of coverage and the automobile line of coverage, *all* of the underlying insurance from both the CGL and the automobile line would have to be exhausted *before either* the USF or the PEIC policy was triggered. This means that the Zurich CGL and the Zurich BAP policies, which provide a combined total obligation per claim of $1 million; Domino's self-insured retention of $1 million; and the Home policy for $1 million would have to be exhausted *before* the USF policy was triggered. Furthermore, the PEIC policy would not be triggered until the Zurich CGL and the Zurich BAP policies, Domino's self-insured retention, the Home policy *and* the USF policy were all exhausted. Under this scenario, Domino's would still have to contribute $2 million toward the settlement to account for the $1 million self-insured retention, and the $1 million fronted Zurich policies; Home would have still been required to contribute $1 million; USF would have still been required to contribute $5 million; and PEIC would have still been required to contribute $3.5 million.

### E. *Prejudgment Interest*

 PEIC argues that Domino's appeal from the district court's award of prejudgment interest is untimely under Fed. R.App. P. 4(a). Rule 4(a) provides in relevant part:

"[T]he notice of appeal . . . must be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from. . . ."

The district court entered a final order granting summary judgment in favor of PEIC on November 1, 1996. Domino's filed a timely notice of appeal from this November judgment on December 2, 1996. On November 14, 1996, PEIC filed a motion to amend the November judgment under Fed.R.Civ.P. 59. The district court granted PEIC's motion and entered an amended judgment on December 9, 1996 ("the amended judgment"). The amended judgment awarded PEIC prejudgment interest at a rate of 10% per annum. Domino's filed a notice of appeal from the amended judgment on January 10, 1997, more than thirty days after the amended judgment was entered. Under Rule 4(a), Domino's appeal from the amended judgment is untimely and must be dismissed.

Domino's argues, however, that its appeal from the amended judgment is timely. It argues that the district court's December 9, 1996, amended judgment did not comply with Fed.R.Civ.P. 58, and the time for appeal has therefore never begun to run. We disagree.

Rule 58 provides: "Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)." The amended judgment clearly complies with this rule-it is set forth in a separate document; it does not contain any facts, law or analysis; and it is self-contained, clearly stating all of the relief that the district court found PEIC entitled to.

 The fact that the amended judgment references the district court's proceedings and decision regarding PEIC's motion to alter the judgment does not change this result. As our cases make clear, a judgment can reference proceedings and/or a previous decision by the court and still comply with the Rule 58 separate document requirement. *See, e.g., Paddack v. Morris,* 783 F.2d 844, 846 (9th Cir.1986) (holding that a five-line document entitled "Supplemental Judgment" and referencing and reaffirming the district court's prior, seven-page order outlining the facts, law and analysis satisfied Rule 58).

 The fact that the district court only entered a minute order prior to entering the separate document captioned as the amended judgment also does not change the result. Rule 58 does not require district courts to enter detailed orders addressing the merits of the case prior to entering the final judgment. In fact, under Rule 58, a district court is not even required to file two separate documents. *See In re Schimmels,* 85 F.3d 416, 421 (9th Cir.1996) (holding, in a bankruptcy case governed by bankruptcy rules which incorporate the federal rules of civil procedure, that the "separate judgment rule does not always require the filing of two separate documents"). Thus, although the district court could have chosen to enter a detailed order addressing the merits of PEIC's motion prior to entering the amended judgment, it also had the option of entering a minute order, as it did, or no order at all.

Finally, it is clear that Domino's was not confused as to whether the December 9, 1996, order was a final order under Rule 58. In its notice of appeal, Domino's states that it is appealing from "the Order Granting Plaintiff's Motion to Amend Judgment and Amended Judgment entered in this action on December 9, 1996."

Domino's had thirty days from entry of the amended judgment to file a notice of appeal. Domino's filed its notice of appeal on January 10, 1997, more than thirty days after entry of the amended judgment. Its appeal from the December 9, 1996, amended judgment is therefore untimely and must be dismissed. The district court's award of 10% prejudgment interest must stand.

## CONCLUSION

Domino's appeal of the district court's award of prejudgment interest (No. 97–55178) is DISMISSED as untimely. The district court's grant of summary judgment in favor of PEIC (No. 96–56858) is AFFIRMED.

No. 97–55178 DISMISSED. No. 96–56858 AFFIRMED.