

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2006

# In Re: Cendant Corp

Precedential or Non-Precedential: Precedential

Docket No. 04-1410

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"In Re: Cendant Corp " (2006). *2006 Decisions.* Paper 660.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/660

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-1410

———————

IN RE: CENDANT CORPORATION
SECURITIES LITIGATION

Sheldon Danuff,
SKAT Capital LP and
Joel D. Zychick,

Appellants

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 98-cv-01664)
District Judge: Honorable William H. Walls

———————

Argued March 9, 2006

Before: AMBRO and BECKER,[*] <u>Circuit Judges</u>,
and STAGG,[**] <u>District Judge</u>

(Filed July 18, 2006)

William J. Bailey, Esquire
Huntington Carver, LLP
312 Kinderkamack Road
Westwood, NJ 07675

James S. O'Brien, Jr., Esquire (Argued)
Leah D. Weitzen, Esquire
Pryor Cashman Sherman & Flynn LLP
410 Park Avenue
New York, NY 10022

     Counsel for Appellants

---

[*] This case was argued before the panel of Judges Ambro, Becker, and Stagg. Judge Becker died before the filing of this Opinion. It is filed by a quorum of the panel. 28 U.S.C. § 46(d).

[**] Honorable Tom Stagg, Senior District Judge for the Western District of Louisiana, sitting by designation.

Max W. Berger, Esquire
Daniel L. Berger, Esquire
Jeffrey N. Leibell, Esquire
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019

Leonard Barrack, Esquire
Gerald J. Rodos, Esquire
Jeffrey W. Golan, Esquire (Argued)
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

      Counsel for Appellees

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Sheldon Danuff, SKAT Capital, and Joel Zychick (collectively, "Appellants") challenge a District Court order rejecting their claims for compensation under a plan of allocation for a class action settlement. At the threshold, this case requires us to decide whether Appellants' notice of appeal was timely filed. Under the rules of civil and appellate

procedure, the notice was timely filed only if the District Court's order ruling against Appellants was not a "separate document" within the meaning of Federal Rule of Civil Procedure 58. To determine whether the order satisfied the separate-document requirement, we must resolve two subsidiary questions: (1) whether Rule 58 mandates that a district court issue two distinct documents when disposing of a case, and (2) whether a lengthy recitation of facts and procedural history prevents an order from complying with the separate-document requirement.

While we reject the contention that the separate-document rule requires two separate documents, we hold that a lengthy discussion of facts and procedural history precludes an order from complying with Rule 58. Because the final order in this case was not a separate document that triggered the typical 30-day appeal period, Appellants' seemingly late notice of appeal fits in the safe harbor Rule 58 and Federal Rule of Appellate Procedure 4(a)(7) provide, and was timely filed; we thus have jurisdiction over the case.

As to the merits, we determine that Appellants are not entitled to compensation under the terms of the allocation plan. Accordingly, we affirm.

## I. Factual and Procedural Background

The relevant facts are undisputed. Appellants held common stock in Getko Group, which was acquired by CUC

4

International ("CUC"); CUC then merged with another company, HFS Incorporated, to form Cendant Corporation ("Cendant"). As a result of these combinations, Appellants received stock in Cendant in exchange for their stock in Getko.

CUC's accounting irregularities spawned a securities class action suit, filed on behalf of all persons or entities who purchased or otherwise acquired publicly traded securities of Cendant and CUC and who were injured thereby. A Plan of Allocation of Net Settlement Fund (the "Plan"), which was previously approved by this Court, *In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001), was crafted to resolve all potential claims. As members of the plaintiff class certified by the District Court, Appellants were entitled to seek compensation from the Net Settlement Fund under the terms of the Plan for losses sustained by holding Cendant (previously CUC) stock during the period from May 31, 1995, to August 28, 1998 (the "Class Period"). This case arises from the claims administrator's determination that Appellants were not entitled to any compensation.

At issue is the Plan's so-called "netting provision," which ensures that claimants only recover for net losses. All three Appellants sold a substantial share of their Cendant holdings during the Class Period—but before the public disclosure of Cendant's accounting irregularities—when the stock price was artificially inflated due to the accounting irregularities; they also

5

sustained considerable losses on securities held after those irregularities were disclosed. Each Appellant, with the possible exception of SKAT, made a net gain; and SKAT reaped a net gain unless its losses are computed on the basis of the date on which its shares became freely tradeable (September 6, 1995) rather than the date on which its shares were acquired (June 27, 1995). Processing Appellants' claims on the basis of the date of acquisition, the claims administrator found that Appellants did not merit compensation under the Plan because the profits they made by selling stock at artificially inflated prices cancelled out any losses they suffered on stock held after the irregularities were disclosed.

The District Court held a hearing to consider the objections of class members whose claims had been rejected. At the hearing, Appellants argued that the netting provision should not have been applied to their claims because the part of the Plan that governs their compensation does not provide for losses to be offset by gains. The District Court rejected this contention, noting that Appellants' argument was at odds with the commonsense principle embedded in the Plan: "If there were a net impact of the fraud upon [a] claimant's holding as a benefit[,] then there is little reason to compensate . . . [such claimant] for any losses." App. 30.

On August 19, 2003, the District Court issued an order granting the class lead plaintiffs' motion to adopt the claims administrator's recommendation to reject all disputed claims

6

(the "Order").  It was entered on the docket on August 21, 2003. Appellants thought that the District Court had not satisfied the separate-document requirement of Rule 58, and were apparently under the impression that they could not appeal the Order until a complementary judgment was separately entered.[1]  Hence, on January 14, 2004, Appellants filed a motion for entry of judgment on the Order.  Appellants now claim that this motion was rendered moot on January 19, 2004, when they say entry of judgment was effected by operation of law pursuant to Federal Rule of Civil Procedure 58(b)(2)(B), and they appealed within 30 days thereafter (February 13, 2004).

We address two questions.  First, we determine whether Appellants filed a timely notice of appeal. As noted above, this requires us to decide whether the District Court's Order satisfied the separate-document rule.  Second, assuming Appellants' notice of appeal was timely filed, we determine whether Appellants are entitled to compensation under the Plan.

## II.  Jurisdiction: Separate-Document Rule

### A.  Background

Federal Rule of Appellate Procedure ("FRAP") 4—in

---

[1] This impression was incorrect.  *See* Fed. R. App. P. 4(a)(2) (allowing parties to file a notice of appeal of a decision or order "before [its] entry").

conjunction with Federal Rule of Civil Procedure 58—sets out the mechanism for determining when the time to appeal begins. FRAP 4(a)(1)(A) requires (with exceptions irrelevant here) that notices of appeal be filed "within 30 days after the . . . order appealed from is entered." Thus, Appellants typically would have had 30 days from the *entry* of the Order to appeal. Under FRAP 4(a)(7)(A)(ii), however, "if Federal Rule of Civil Procedure 58(a)(1) requires a separate document" to put the parties on notice that the time to appeal has started, the appeal period begins on the earlier of (1) when that separate document is entered or (2) when 150 days have run from the entry of the Order in the docket.

Because certain exceptions in Rule 58 do not apply here, the general requirement of Rule 58 governed: "[e]very judgment[2] . . . must be set forth on a separate document," Fed. R. Civ. P. 58(a)(1). To know whether Appellants' appeal was

---

[2] Although Rule 58(a)(1) refers to a "judgment," Federal Rule of Civil Procedure 54(a) provides that "'[j]udgment' as used in these rules includes a decree and *any order from which an appeal lies*." Fed. R. Civ. P. 54(a) (emphasis added).

Also, the separate-document requirement applies to partial dispositions such as the Order before us—it was certified as final by the District Court under Federal Rule of Civil Procedure 54(b). *See* Fed. R. Civ. P. 58(a)(1) (not including Rule 54(b) certification orders in list of exceptions to separate-document requirement); *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 363 (2d Cir. 2003).

timely, we must determine which date in Rule 4(a)(7)(A)(ii) applies to begin the appeal period: August 21, 2003, or January 19, 2004. If the former, Appellants' appeal—filed on February 13, 2004—was too late; if the latter, the appeal was timely. The answer depends on whether the District Court's Order qualifies as a separate document.

Both Rule 58 and Rule 4 were amended in 2002. Before 2002, if a district court did not enter a separate judgment, the appeal period never started—and thus theoretically never ended. After the amendments, the lack of a separate document only gives the potential appellant another 150 days. The situation for potential appellants is now more certain, but the touchstone of the separate-document requirement remains: a judgment separate from an opinion or decision.

We face the question whether the Order issued by the District Court (after an oral ruling) meets the separate-document requirement when it contains an extensive factual and procedural background discussion.

**B. Analysis**

Appellants assert that the Order was not a separate document in the way required by Rule 58(a)(1). Instead, they claim that judgment was entered by operation of law on January 19, 2004, pursuant to Rule 58(b)(2)(B) (providing that a judgment entered in the civil docket and subject to Rule

58(a)(1), but not set forth in a separate document, will be deemed "entered . . . when 150 days have run from entry in the civil docket . . . [August 21, 2003]"). (One hundred fifty days from August 21, 2003, is January 19, 2004.) Appellants filed their notice of appeal almost six months after the Order was entered but less than 30 days from the date on which Appellants claim the judgment was entered by operation of law. Whether their notice of appeal was timely filed thus depends on whether the Order was a separate document within the meaning of Rule 58(a). If it was, Appellants' notice of appeal was not timely filed and their appeal must be dismissed.

Our Court's application of Rule 58(a) is controlled by *Local Union No. 1992, IBEW v. Okonite Co.*, 358 F.3d 278, 285 (3d Cir. 2004). There we held that an "order's denomination as an 'order,' rather than a 'judgment,' does not mean that it fails to satisfy the separate document requirement." *Id.*[3] Instead, we explained that an order will be treated as a separate document if it meets three criteria: first, the order must be self-contained and separate from the opinion; second, the order must note the relief granted; and third, the order must omit (or at least substantially

---

[3] Some of our sister Circuits are divided on this point. *Compare Kanematsu-Gosho, Ltd. v. M/T Messiniaki Aigli*, 805 F.2d 47, 49 (2d Cir. 1986) (*per curiam*) (holding that a document must be denominated a "judgment" in order to satisfy Rule 58), *with United States v. Johnson*, 254 F.3d 279, 285 n.7 (D.C. Cir. 2001) ("The fact that the page is labeled 'Order' rather than 'Judgment' is not relevant.").

omit) the District Court's reasons for disposing of the parties' claims. *See id.* (noting, by way of qualification as to the third criterion, that some "courts of appeals have found that including a bit of analysis does not run afoul of the separate judgment requirement," but reserving judgment on that issue).

The Order satisfies the first criterion. The whole document—not just the last page—is presented as an "order," rather than an opinion, and this designation is confirmed by the docket. The Order is "self-contained" in the sense that it is not stapled or otherwise attached to an opinion or memorandum. Indeed, the only "opinion" that the District Court offered was its oral ruling on May 16, 2003.[4]

---

[4] The District Court made clear that its oral ruling was the only opinion it would make available. *See* App. 27 ("I'm not going to spend time, gentlemen, crafting an opinion because frankly the issues are so uncomplicated that those who dislike the decision can order the [transcript] and take the appeal."). In addition, at the end of the May 16 hearing the District Court suggested that its forthcoming order was the only document needed to get the appeals process started. *See* App. 30 ("So, those claims are denied. You can send in the order and I will sign it [and] then you can take your appeals."). While it may seem counterintuitive, the fact that the parties knew, or should have known, that the Order was intended to serve as a final judgment does not make it compliant with Rule 58. *See Gregson & Assocs. Architects v. Gov't of the Virgin Islands*, 675 F.2d 589, 592 (3d Cir. 1982) (applying separate-document

Appellants argue that the Order is not "separate from" the District Court's prior oral ruling because it is the sole document issued by the District Court that purports to dispose of Appellants' claims. The only authority they cite for this proposition is *Miller v. Marriott International*, 300 F.3d 1061 (9th Cir. 2002), where the Ninth Circuit held that, "because the dismissal order provide[d] the basis for the entry of judgment," it is but a single document, and "one document, by definition, cannot also constitute a separate document." *Id.* at 1064.

While on its face *Miller* seems logical, we decline to follow it for several reasons. Rule 58 does not expressly state that the "separate document" must be distinct from *another document* (as opposed to an oral decision on the record). And we cannot discern any value that would be furthered by finding a two-document rule implicit in the text. Hence, the Rule is most reasonably read to mean only that the judgment must be set forth in a document that is independent of the court's opinion or decision, regardless whether that opinion takes written form.

Notably, *Miller* is at odds with every other authority we have found, including earlier Ninth Circuit precedent. In *United*

requirement and holding that notice of appeal was timely filed because 30-day period never began to run, even though appellant correctly "believed that the order was the final judgment"). Put simply, Rule 58 is a touch-the-base requirement that lays perception aside.

12

*States v. Schimmels* (*In re Schimmels*), 85 F.3d 416 (9th Cir. 1996), for example, that Court held that a short order satisfied the separate-document requirement even though the "order was not followed by an additional document entering judgment." *Id.* at 421.[5]  The Court observed:

> The separate judgment rule does not always require the filing of two separate documents. . . . [W]hen a court enters a short order that clearly constitutes a final decision, that short order meets the separate judgment rule. Similarly, if a court grants a summary judgment without writing an opinion or memorandum, then the order granting summary judgment is enough to meet the separate document requirement. . . . The separate judgment rule requires that the court enter a judgment or an order—it does not require that a court enter an initial memorandum or opinion.

*Id.*; *see also Pac. Empls. Ins. Co. v. Domino's Pizza*, 144 F.3d 1270, 1278 (9th Cir. 1998) ("[U]nder Rule 58, a district court is

---

[5] *Schimmels* applied Bankruptcy Rule 9021, which contains a separate-document rule "identical to Federal Rule of Civil Procedure 58." 85 F.3d at 420.

13

not even required to file two separate documents."); *Laidley v. McClain*, 914 F.2d 1386, 1390 (10th Cir. 1990) (holding that a summary judgment order met the separate-document requirement and that the rule thus did "not require that two documents be used instead of one"), *superseded by rule on other grounds*; *United States v. Perez*, 736 F.2d 236, 238 (5th Cir. 1984) (*per curiam*) (holding that a district court order did not violate separate-document requirement of Rule 58, as "[t]he mere fact that the first sentence of the order adopts the magistrate's report and recommendation . . . does not require that two documents be used by the district court rather than one"), *superseded on other grounds as recognized in Kadelski v. Sullivan*, 30 F.3d 399, 402 (3d Cir. 1994); *United States v. Clearfield State Bank*, 497 F.2d 356, 358–59 (10th Cir. 1974) (rejecting as "unfounded" the argument that "two documents are required in all cases," and holding that Rule 58 was satisfied where no opinion was written because the "order granting summary judgment [was] itself a separate document").

In short, the Order satisfies the first of the three criteria set forth in *Okonite* for a separate document to exist under Rule 58(a) because it was a "self-contained" document that was separate from the District Court's oral opinion.

The second criterion set out in *Okonite* is also met, as the

14

Order does state the relief granted.[6]

That leaves the third criterion—omission of reasoning. As noted above, our Court has yet to rule whether an order that includes a modicum of analysis may satisfy the separate-document rule. *See Okonite*, 358 F.3d at 285. We need not resolve this question now, as the prefatory "whereas" clauses of the Order contain only facts, procedural history, and summary conclusions—not reasoning. Hence, the practical question we must decide is not whether a little bit of reasoning is acceptable, but whether a protracted recitation of facts and procedural history precludes the Order from serving as a "separate document" under Rule 58(a)(1).

The aim of the separate-document requirement suggests that a lengthy description of facts and procedural history takes an order outside the realm of Rule 58(a). As the Supreme Court has explained, the "sole purpose of the separate-document requirement . . . was to clarify when the time for appeal . . . begins to run." *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384 (1978) (*per curiam*). Clarification was needed because, prior to the adoption of the separate-document rule,

---

[6] The Order reads: "Lead Plaintiffs' motion for an Order adopting the Claims Administrator's recommendation to reject all disputed Claims as set forth in Exhibits A and B hereto is GRANTED. All such Claims, as set forth in Exhibits A and B hereto[,] are rejected."

15

court clerks would often enter judgments in the civil docket on the basis of opinions or memoranda "containing some apparently directive or dispositive words." *Id.* (internal quotation marks omitted). If the opinion or memorandum on which an entry was based did not contain all the elements of a judgment, or if the judge later signed a formal judgment, it then became "a matter of doubt whether the purported [initial] entry of a judgment was effective" for purposes of starting the appeals period. *Id.* at 385 (internal quotation marks omitted). The addition of the separate-document requirement to Rule 58 was intended to "'eliminate[] these uncertainties by requiring that there be a judgment set out on a separate document—*distinct from any opinion or memorandum . . . .*'" *Id.* (quoting Fed. R. Civ. P. 58 advisory committee notes on 1963 amendments) (emphasis added).

The goal of Rule 58(a) is to impose a clear line of demarcation between a judgment and an opinion or memorandum. The question thus becomes whether an extensive recitation of facts and procedural history is as fatal, for separate-document purposes, as an extensive recitation of legal reasoning and analysis.

Facts—and conclusions of law—may be either stated orally at the close of evidence or written in an opinion or memorandum. Fed. R. Civ. P. 52(a). Neither are to appear in the Rule 58 judgment. *Cf. id.* A lengthy overview of background information, while not setting out the basis for a

16

decision as much as does legal reasoning, nevertheless partakes more of a judicial opinion or memorandum than it does of a judgment. Just as for legal reasoning, the purpose of providing such a factual overview is not to lay out the relief granted, but to offer context in which the court's decision may be understood. Because of the purpose of Rule 58—to eliminate uncertainty—and because a putative judgment containing an extensive factual discussion might look to a party more like an opinion than a judgment, the mechanical application of Rule 58 does not, we believe, contemplate judgments containing extensive factual recitations to be separate documents.

Our conclusion that the separate-document requirement does not allow for an extended presentation of facts and procedural history is supported by Model Forms 31 and 32 of the Federal Rules of Civil Procedure ("Judgment on Jury Verdict" and "Judgment on Decision by the Court"). *See* Fed. R. Civ. P. 58 advisory committee notes on 2002 amendments. Added as part of the 2002 amendment to Rule 58, these forms are intended to facilitate mechanical application of the Rule by providing examples of qualifying documents. We note the contrast between the Forms' brief statements of the terms of the judgments and the extended recitation of factual and procedural history in the Order before us.

The proposition that an extended presentation of facts and procedural history runs afoul of the separate-document requirement also finds support in the case law. *See, e.g.*,

17

*Diamond v. McKenzie*, 770 F.2d 225, 230 n.10 (D.C. Cir. 1985) (*per curiam*) (holding that a three-page order containing two sentences on the case's procedural posture and three sentences summarizing the court's conclusions transformed the order into a "combined decision and order"). Indeed, we do not know of any authority holding that facts and procedural history should be treated differently than reasoning for purposes of determining whether an order satisfies the separate-document requirement. In all cases of which we are aware, the court's analysis has focused on the extent to which the order includes material not traditionally found in a judgment, regardless whether that material consists of facts, history, or reasoning. *See, e.g.*, *Schimmels*, 85 F.3d at 422 (holding that an order denying a motion for reconsideration satisfied the separate-document requirement where "[t]he order contains only a one-sentence recitation of the procedure, documents, and arguments considered by the court in denying the motion. There is no explanation of the reasoning of the court.").

Here, the District Court issued a six-page Order, five pages of which were devoted to expounding the background of the case. Significantly, this overview was not needed to state the relief granted. *See* Fed. R. Civ. P. 58 advisory committee notes on 2002 amendments ("It is easy to prepare a separate document that recites the terms of the judgment *without offering additional explanation* or citation of authority." (emphasis added)). Nevertheless, the overview and the judgment were both set out in the same document. In these circumstances, the

18

Order does not satisfy the separate-document requirement. After all, "the rule is designed to simplify and make certain the matter of appealability." *Bankers Trust Co.*, 435 U.S. at 386 (internal quotation marks omitted). That goal would be thwarted by foreclosing an appeal where a party was reasonably in doubt whether a final order complied with the formalities of Rule 58(a). *See United States v. Indrelunas*, 411 U.S. 216, 221–22 (1973) (*per curiam*) ("[T]he separate document provision . . . [is] a mechanical change that must be mechanically applied in order to avoid new uncertainties as to the date on which a judgment is entered." (internal quotation marks omitted)); *see also id.* at 219 (emphasizing that the purpose of the separate-document requirement was "to remove uncertainties as to when a judgment is entered").[7]

---

[7] Attempting to show that the Order satisfies the separate-document requirement, Appellees note that in its last paragraph the document is twice referred to as a "Final Order." *See* Appellees' Letter Brief dated March 10, 2004, at 3. But this fact does not help their cause, as an order or judgment may be final without complying with the formalities of Rule 58. *See Shalala v. Schaefer*, 509 U.S. 292, 303 (1993) ("Since the District Court's April 4 remand order was a final judgment, a 'separate document' of judgment should have been entered." (citation omitted)); *id.* at 303 n.6 ("By entering a . . . remand order, the District Court did enter a *judgment*; it just failed to comply with the formalities of Rule 58 in doing so." (emphasis in original)); *Diamond*, 770 F.2d at 229 (holding that the fact that a document was a "'final order of the Court'" does not resolve the Rule 58

* * * * *

In sum, Appellants' notice of appeal was only timely if the Order was not a separate document within the meaning of Rule 58(a). The Order was not because it contained an extended discussion of facts and procedural history. This discussion raised doubt to Appellants whether a final judgment had been entered. Doubt is exactly what the separate-document requirement was designed to avoid. *See Bankers Trust Co.*, 435 U.S. at 386 ("[Rule 58] should be interpreted to prevent loss of the right of appeal, not to facilitate loss." (internal quotation marks omitted)); *Diamond*, 770 F.2d at 230 ("It is precisely this kind of uncertainty about whether the District Court intended to enter a final order that warrants the mechanical application of Rule 58.").

Our decision here is designed to make the mechanical application of Rule 58 easier, and more simple, for judges and parties. For judges, the separate judgment should be as minimal as possible to comply with Rule 58's requirements, and should include little more.[8] (See, for example, Forms 31 and 32 of the

_____

problem, since the "question whether an order is a final order is separate from the question whether a separate document setting forth the judgment has been properly entered").

[8] Indeed, we cannot resist observing that the spare simplicity of a Rule 58 separate judgment (as bare-boned as "Defendant's motion for summary judgment is denied.") seems to many of us

20

Federal Rules of Civil Procedure. In fact, the District Court's language quoted in our footnote 6 is all that the Court needed.) For parties, these minimal judgments make clear when the time to appeal is at hand.[9]

In this context, Appellants were entitled to consider January 19, 2004, as the "magic date" to begin their appeal period. Filing that appeal on February 13, 2004, was thus timely.

## III. Merits

Because the notice of appeal was timely filed, we now reach the merits. We must decide whether the District Court erred in granting lead plaintiffs' motion to adopt the claims

---

counter to the custom of "talking orders" that explain in detail the context and reasons for a ruling (thus avoiding the need for an accompanying opinion).

[9] We note, however, that Appellants took the wrong course in their uncertainty. When parties are in doubt about whether the separate judgment rule has been met, they should file a notice of appeal. A too-late appeal is fatal, but a too-early appeal provides safety, as a premature appeal becomes effective on the entry of the judgment or order, Fed. R. App. P. 4(a)(2). Here, an early appeal would have avoided all dangers (including the possibility that we might have held the Order to have satisfied the separate-document requirement).

administrator's recommendation to reject all disputed claims, including that of Appellants.

The backdrop for these rejections is as follows. Appellants were denied any payment from the settlement, which they claim to be an error. Their principal contention (although the different Appellants each have different individual arguments) is that the District Court improperly "netted" their gains on the sale of Cendant stock against the losses calculated under the Plan. This netting of gains and losses left them with no payments due under the Plan.

Section IV of the Plan gives specific calculations of allowed loss amounts for each share held to the end of the Class Period.[10] But Section V(B) does two things. First, it matches stock acquisitions with subsequent stock sales on a first-in-first-out basis—the matching provision. Second, it subtracts all stock-sale profits from any losses to reduce claimant recoveries—the netting provision. We quote Section V(B) in full (adding emphasis to show the matching and netting provisions):

> For Class Members who made multiple purchases, acquisitions or sales during the Class Period, the earliest subsequent sale shall be

---

[10] Appellants are not entitled to any compensation for the shares they sold before April 15, 1998.

*matched* with the earliest purchase and chronologically thereafter for purposes of the Claim calculations.

> *PLEASE NOTE*: ALL PROFITS SHALL BE SUBTRACTED FROM ALL LOSSES ON ALL TRANSACTIONS OF CUC AND CENDANT PUBLICLY-TRADED SECURITIES DURING THE CLASS PERIOD TO DETERMINE THE *NET* CLAIM OF EACH CLASS MEMBER. IF A CLASS MEMBER MADE A *NET* PROFIT, THE VALUE OF HIS, HER OR ITS CLAIM SHALL BE ZERO.

Appellants all want some recovery based on the shares they held to the end of the Class Period (10,790 shares for Danuff; 2,103,196 shares for SKAT; and 56,250 shares for Zychick). Each Appellant made some profits on the stock they sold during the Class Period. And the District Court found that—based on the netting provision—those profits outweighed any losses Appellants had on the shares they continued to hold, thus giving them no recovery.

Appellants make three arguments in opposition to the Plan's netting provision. First, all assert that the "general" netting provision of the Plan does not apply to any of them because their "specific" loss calculations are governed solely by another Plan section, which does not contain a netting provision.

23

Second, Danuff and SKAT claim that the netting provision does not apply to them because they did not engage in "multiple transactions" that trigger netting. Third, SKAT contends that, even if deemed subject to the netting provision, it was entitled to compensation because it did not reap a net gain.

We address each claim in turn.[11]

## A. Whether netting provision applies to Appellants?

Appellants first claim that the netting provision in Section V(B) of the Plan does not apply to them because the Plan elsewhere provides that their losses should be calculated solely on the basis of the methodology set forth in Plan Section IV. As Section IV carves out a "specific" rule for Cendant stock obtained in exchange for the stock of acquired companies (such as Getko), Section V's general provisions, they argue, do not apply to them.

We disagree. Although the specific usually controls the general in contract construction, we are to construe a contract as a whole. *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973). Both provisions apply to the pool of claimants; they simply have different functions. Section IV

---

[11] The District Court's interpretation of the Plan is reviewed *de novo*. *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 350 F.3d 360, 364 (3d Cir. 2003).

24

covers all claimants, dividing potential claims into five categories; its five corresponding parts calculate the loss amount for each kind of claim. But the loss amount is not the same as the net claim. Section V applies to all claimants who sold stock acquired during the Class Period or who made profits on Cendant stock sales. Section V does not change the way that losses are calculated, but it provides that those losses should be offset by any profits to arrive at the net claim amount. Both provisions are specific within their spheres. Section IV is specific to loss amounts (as the title "SPECIFIC LOSS AMOUNTS" indicates), and Section V is specific to net claims (by reducing loss amounts for claimants who have made profits on Cendant stock sales). Moreover, because Section IV governs the loss calculation of every claim, accepting Appellants' argument would rob Section V of any effect.

The text of the netting provision of the Plan's Section V(B) (quoted above) is the only part of the Plan printed in all caps, and its language could not be more explicit ("ALL PROFITS SHALL BE SUBTRACTED FROM ALL LOSSES"). Yet Appellants not only fail to offer a valid basis for arguing that the netting provision does not apply to them, and they also fail to explain why the Plan might be crafted to compensate shareholders who reaped a net profit.

Section V(B)'s matching provision is also part of the Plan's general purpose, designed to apply to every claimant who sold shares during the Class Period. Complementing Section

25

V(B) is Section II(B).  It describes how loss amounts will be calculated in general and provides that, "[i]n calculating the Loss Amount for each claim, a sale of a security during the Class Period will be matched *first* against those securities in the opening position [*i.e.*, held before the Class Period], and then matched chronologically against each purchase or acquisition of that security made during the Class Period."  Plan § II(B) (emphasis in original).  This makes clear that matching will be performed for each claimant, where that claimant sold any shares.

Appellants' interpretation is thus objectionable for three reasons: it violates the principle that a legal text should be interpreted to give effect to every provision, *see Capitol Bus Co.*, 478 F.2d at 560 ("A contract is to be considered as a whole, and, if possible, all its provisions should be given effect . . . ."); it departs from the unambiguous terms of the Plan; and it carves out an unexplained and inexplicable exception to the netting provision.

**B.  Whether Danuff and SKAT escape the netting provision because they did not engage in multiple transactions?**

Two Appellants, Danuff and SKAT, argue that the netting provision does not apply to them because they did not engage in multiple transactions.  In support of this claim, they note that "both Appellants made but one sale of a portion of his

[its] shares, holding the remaining shares beyond the end of the Class Period." In other words, Danuff and SKAT contend that, because they made only one sale, they were involved in only one transaction. The assumption underlying this argument is that the initial acquisition of their shares was not a transaction within the meaning of Section V(B).[12]

This assumption is invalid for three reasons. First, the text of the provision does not exclude an initial acquisition from the phrase "purchases, acquisitions or sales." Given that an initial acquisition is a type of acquisition, the text of the Plan would seem to favor its inclusion.

Second, excluding the initial acquisition does not accord with the purpose of the netting provision—to make sure that the calculation of compensable losses is offset by profits, many of which were reaped because of artificially high share prices attributable to fraudulent accounting practices. That aim is no less on point when a claimant has only made one sale during the Class Period. Thus, it makes no sense to think that the netting provision is not triggered by the sales executed by Danuff and SKAT.

---

[12] Danuff and SKAT do not argue that the term "multiple" means more than two. "Multiple" is commonly defined as "more than one." *See The American Heritage Dictionary of the English Language* 1186 (3d ed. 1992).

Third, if Section V(B)'s matching provision applies to Danuff and SKAT, its netting provision also applies to them. As noted above, Section V(B)'s matching provision applies to each claimant who acquired securities during the Class Period and then sold securities during the Class Period. *See also* Plan § II(B). Danuff and SKAT both acquired CUC securities during the Class Period. The deemed date of acquisition was the effective date of the Getko–CUC acquisition: June 27, 1995. Plan § IV(B)(2)(a). Danuff and SKAT sold some of these securities during the Class Period. Thus, they are subject to Section V(B)'s matching provision. There is no sensible reason, therefore, that they would not be subject to Section V(B)'s netting provision as well.

Significantly, they do not identify any interest that would be served by restricting the reach of the netting provision to claimants who have made more than one sale. Nor do they explain the anomaly their interpretation would yield: for example, a claimant who sold 500 shares on one occasion would not be subject to the netting provision, but a claimant who sold 250 shares on two separate occasions would, even though both sold a total of 500 shares.

In sum, the text and purpose of the netting provision are both at odds with the interpretation urged by Danuff and SKAT.

**C. Whether SKAT had a net loss or gain under the**

28

**Plan?**

Finally, Appellants argue that SKAT's sale of its Cendant stock during the Class Period should have no effect on its recovery for losses from the stock it held until the end of the Class Period. In any event, they argue, even if netting does apply, it did not realize a net gain and should receive some money from the settlement.

As for the first argument, the plain language of the netting provision controls. It reads: "All profits shall be subtracted from all losses on all transactions of CUC and Cendant publicly-traded securities during the Class Period to determine the net claim of each Class Member. If a Class Member made a net profit, the value of his, her or its claim shall be zero." Plan § V(B) (capitalization altered). SKAT made a sale during the Class Period, and that sale resulted in some profits. Under the netting provision, this profit must be set off against SKAT's losses to determine its net claim. SKAT's stock sales do have an effect on its recovery for losses from unsold stock.

Meeting the second argument requires some arithmetic. SKAT describes itself as having a $3,188,385 profit from its sale and a $3,407,178 loss under Section IV(B)(2). Thus, it argues that it had a net loss (and consequently a payable claim). The principal problem with SKAT's calculations is that it used

29

September 6, 1995,[13] as the acquisition date.  As noted above, the correct acquisition date is June 27, 1995.  *See* Plan § IV(B)(2)(a).

SKAT sold 261,129 shares on January 20, 1998, at $34.88 each—for a total of $9,108,180.  The stock price on June 27, 1995, was $18.44.  SKAT's January 20, 1998 sale thus represented a $4,292,961 profit—that is, 261,129 multiplied by the share-price difference ($16.44) between the correct acquisition date (June 27) and the sale date (January 20, 1998).

So we know SKAT's profits ($4,292,961).  Under the netting provision, we must subtract these profits from all losses on Cendant securities transactions.  Plan § V(B).  If SKAT is left with a net profit, it does not get a payout from the Plan.  *Id.*

Now we must calculate SKAT's losses on Cendant stock.  The Plan provides that, for holders of Cendant stock acquired in a business acquisition (like the Getko–CUC merger), we multiply the number of unsold shares held by SKAT (2,103,196) by the Plan's defined per-share loss amount.  *Id.* § IV(B)(2)(a).  This per-share loss amount is based on the amount of artificial inflation (from the accounting irregularities) built into Cendant's share price.  *Id.* § III.  The Plan provides a specific per-share loss amount for each acquisition date in the Class Period.  *Id.* tbl.A.  The per-share loss amount for June 27, 1995, is $0.66.

_____

[13] SKAT's brief misstates this as "September 6, 2004."

Multiplying $0.66 times 2,103,196 gives us $1,388,109—SKAT's losses on Cendant stock. Netting SKAT's profit ($4,292,961) and its loss ($1,388,109) gives SKAT almost $3 million in net profit.

The bottom line: SKAT's profit far outweighs its loss amount. Thus, it is not entitled to any payout.

## IV. Conclusion

In sum, we reach two conclusions. As to jurisdiction, we hold that Appellants filed a timely notice of appeal on February 13, 2004. The District Court's final order failed to comply with the separate-document requirement of Federal Rule of Civil Procedure 58. Lengthy recitation of facts and procedural history prevents an order from serving as a separate document within the meaning of the Rule. Because the District Court's order did not satisfy Rule 58, the time limit for filing an appeal did not start to run until January 19, 2004, when entry of judgment was effected by operation of law.

As to the merits, we conclude that none of Appellants' three arguments is meritorious. First, Sections IV and V of the Plan are not mutually exclusive provisions; thus, Appellants are not exempt from the netting provision of Section V(B) simply because the method of computing their loss amount is set out in Section IV. Second, Danuff and SKAT err in asserting that they did not engage in multiple transactions; because the initial

31

acquisition of Cendant stock counts for purposes of the multiple transactions provision, any subsequent sale suffices to trigger the netting provision. Finally, SKAT is not entitled to compensation under the Plan because, under its terms, SKAT reaped a net gain rather than a net loss.

We thus affirm the judgment of the District Court.