

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-19-2007

# LeBoon v. Lancaster Jewish

Precedential or Non-Precedential: Precedential

Docket No. 05-2073

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"LeBoon v. Lancaster Jewish" (2007). *2007 Decisions*. Paper 332.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/332

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-2073

———————

LINDA LEBOON,

Appellant.

v.

LANCASTER JEWISH COMMUNITY CENTER
ASSOCIATION

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 04-cv-00430)
Magistrate Judge: Hon. Jacob P. Hart

———————

Argued on September 26, 2006

Before: RENDELL, CHAGARES and ROTH, <u>Circuit Judges</u>

(Opinion Filed September 19, 2007 )

J. Michael Considine, Jr., Esquire **(ARGUED)**
Suite 100
12 East Barnard Street
West Chester, PA    19382

        Attorney for Appellant

Daniel J. Brennan, Esquire
Christine N. Schultz, Esquire **(ARGUED)**
Susanin, Widman & Brennan, P.C.
455 South Gulph Road
Suite 240, Executive Terrace
King of Prussia, PA   19406

      Attorneys  for Appellee

---

O P I N I O N

---

**ROTH**, Circuit Judge:

In this employment discrimination case, a former employee of the Lancaster Jewish Community Center claimed discrimination on the basis of religion (evangelical Christianity) and retaliation for protected EEO activity.  The District Court granted summary judgment in favor of the employer.

We first find that we have jurisdiction to hear the appeal although it was filed over 30 days after the docketing of the District Court's summary judgment opinion and order; because the District Court did not comply with the separate-document rule, the employee had 180 days from the date of docketing to file her appeal.   Second, we affirm the District Court because (a) during the relevant period the Lancaster Jewish Community Center qualified as a "religious corporation, organization, or institution" exempted from the religious discrimination provisions of Title VII; and (b) the employee has not produced sufficient evidence of a causal link between her alleged EEO activity and her termination.  Finally, we hold that the District Court did not abuse its discretion in denying the employee's motion to reopen discovery after she had filed a motion for summary judgment.

## I. Factual and Procedural Background

Plaintiff-appellant Linda LeBoon, an evangelical Christian, was employed as a bookkeeper by the Lancaster Jewish Community Center Association (LJCC) from November, 1998, until August 30, 2002, when she was terminated.[1]

The LJCC was a non-profit corporation located in Lancaster County, Pennsylvania. Its stated mission was to "enhance and promote Jewish life, identity, and continuity." During the relevant time period it was managed by a Board of Trustees, a number of committees, and an executive director. Its bylaws provided that the rabbis of the three area synagogues serve *ex officio* as non-voting members of the Board.

The LJCC operated a variety of programs, including a summer camp and preschool, and published a newspaper, the *Lancaster Jewish News*. It held events for various Jewish holidays, including a Hanukkah dinner. Its funding came from a variety of sources, including an average of 16.5% annually from the Lancaster Jewish Federation during the time of LeBoon's employment. It also received aid from the United Way for certain programs. The remaining sources of revenue were membership dues, program fees, rents, and donations from individuals and synagogues. Membership was open to Jews and Gentiles alike.

At the beginning of 2002, the LJCC hired Natalie Featherman as the new interim Executive Director. It is essentially undisputed that the LJCC was in serious financial trouble when Featherman took over – just one month later, the LJCC held a retreat to discuss money issues.[2] LeBoon admits to

_____

[1] At the beginning of 2004, the LJCC merged with the Lancaster Jewish Federation; the resulting entity is the Jewish Community Alliance of Lancaster.

[2] LeBoon attempts to argue that the LJCC was in better financial condition than it says it was by pointing to year end financial numbers. The record reflects, however, that the

3

not trusting Featherman and also stated that her relationship with Featherman began to deteriorate in the spring of 2002 because of a memo Featherman wrote directed at two other LJCC employees. LeBoon further stated that Featherman had generally poor relations with the entire LJCC staff.

In March, 2002, a custodian named Troy Rollman was terminated. LeBoon testified she opposed his termination because she believed it was motivated by a disability that resulted in a speech impediment. On May 30, 2002, Featherman terminated Sandy Simms, an African-American employee at Lancaster's Office of Aging, who performed receptionist duties at the LJCC. Simms had failed to arrive at work the previous day and never alerted the LJCC that she would be absent. LeBoon claims, with the support of a co-worker's affidavit, that she complained to Featherman that Simms was fired because of her race.

As the spring of 2002 turned to summer, the LJCC's financial prospects did not get any warmer. According to the LJCC, Featherman concluded that LeBoon's position (a full-time bookkeeper) was unnecessary and could be performed by another co-worker. On August 30, 2002, three months after Simms' discharge and six months after Rollman's, Featherman fired LeBoon.

LeBoon filed suit in federal court alleging religious discrimination, retaliation, and wrongful discharge in violation of Pennsylvania's public policy. As relevant for our purposes, she claimed that she was terminated because she is a Christian and Featherman learned that LeBoon had attended a Jews for Jesus concert a few days before her termination, or, alternatively, in retaliation for LeBoon's complaints about the terminations of Rollman and Simms.

_____

numbers looked better than they really were because the LJCC received an advance on the subsequent year's funds.

4

With the consent of the parties, the District Court referred this case to the Magistrate Judge to conduct all proceedings pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. On December 16, 2004, the Magistrate Judge granted the LJCC's motion for summary judgment and denied LeBoon's cross motion for summary judgment. As to LeBoon's claim of religious discrimination, the Magistrate Judge found that it was precluded by Title VII's exemption of religious corporations from the prohibition against religious discrimination. The Magistrate Judge also dismissed LeBoon's retaliation claim because she failed to establish evidence from which a reasonable jury could infer causality. Finally, the Magistrate Judge dismissed the state law claim for lack of federal jurisdiction.

On December 23, LeBoon filed a motion for reconsideration. In its response, the LJCC conceded that the decision had been based in part on a manifest error of fact regarding the percentage of the LJCC's funding that came from the Lancaster Jewish Federation Campaign. On January 14, 2005, the Magistrate Judge entered an order vacating the order of December 16, "so that the Court may reconsider this matter." After reconsidering the case in light of the correct facts, the Magistrate Judge once again determined that the LJCC was a religious organization exempted from the religious discrimination provisions of Title VII and reissued an order on February 17, 2005, granting the LJCC the same relief it provided in its December 16, 2004, order.

Approximately a week later, LeBoon filed a second motion for reconsideration. The motion was a verbatim copy of the motion for reconsideration filed after the Magistrate Judge's December 16, 2004, ruling. The Magistrate Judge denied this second motion for reconsideration on March 11, 2005. LeBoon filed her notice of appeal on April 4, 2005.

5

## II. **Discussion**

### A. **Jurisdiction**

The trial court had jurisdiction pursuant to Title VII of the Civil Rights Act of 1964 and 28 U.S.C. § 1331. The LJCC contests our jurisdiction of the appeal, however, on the grounds that LeBoon's notice of appeal was untimely. We have jurisdiction to review our own jurisdiction when it is in doubt, *see Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995), and find that we have appellate jurisdiction under 28 U.S.C. § 1291.

The LJCC argues that we lack jurisdiction of LeBoon's appeal because LeBoon did not file a notice of appeal within 30 days of the Magistrate Judge's February 17, 2005, order granting, for a second time, the LJCC's motion for summary judgment. *See* Fed. R. App. P. 4. LeBoon responds that her appeal is timely because her second motion for reconsideration, filed on February 25, 2005, tolled the 30-day limit to file an appeal; since the Magistrate Judge did not rule on that second motion until March 11, 2005, her April 4, 2005, notice of appeal was within the 30-day deadline. Although we question whether a litigant can toll the time for appeal by filing a second, essentially identical motion for reconsideration of a final order, we need not decide the issue. The reason for this is the Magistrate Judge's failure to comply with the separate-order requirement of Federal Rule of Civil Procedure 58. Under Rules 58(b) and 79(a), LeBoon had 180 (not 30) days to appeal from the order of February 17, 2005; thus her appeal, noticed on April 4, was timely.

Under Federal Rule of Appellate Procedure 4(a)(1)(A), notices of appeal must generally be filed "within 30 days after the . . . order appealed from is entered." However, "if Federal Rule of Civil Procedure 58(a)(1) requires a separate document," the judgment is considered entered "when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs: [1] the judgment or order is set forth on a separate document, or [2]

150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a)." Fed. R. App. P. 4(a)(7)(A)(ii). Thus, if a certain order is subject to the separate-document requirement of Federal Rule of Civil Procedure 58 and no separate document exists, an appellant has 180 days to file a notice of appeal – 150 for the judgment to be considered "entered," plus the usual 30 days from the entry of judgment.

Federal Rule of Civil Procedure 58(a)(1) requires every judgment and amended judgment to be set forth in a separate document unless it is "an order disposing of a motion . . . (D) for a new trial, or to alter or amend the judgment, under Rule 59; or (E) for relief under Rule 60." Fed. R. Civ. P. 58(a)(1). To summarize the convoluted procedural history again, the Magistrate Judge initially ruled on cross-motions for summary judgment on December 16, 2004. On December 23, LeBoon filed a motion for reconsideration, pointing out a factual error in the court's opinion; in its response, the LJCC conceded that the decision had been based in part on a manifest error of fact. Consequently, on January 14, 2005, the Magistrate Judge entered an order vacating the order of December 16, "so that the Court may reconsider this matter." On February 17, 2005, the Magistrate Judge issued an Opinion and Order that again denied LeBoon's motion for summary judgment and granted the LJCC's.

Although at first blush the February 17 Order could be understood as merely ruling on LeBoon's Rule 59 motion for reconsideration, it is clear that in fact its primary function was to dispose of the cross-motions for summary judgment, which were again pending because the earlier order ruling on them had been vacated. Thus the February 17 Order was subject to the separate-order rule. *See* Fed. R. Civ. Pro. 58 advisory committee notes (2002 amendment) (when the disposition of a post-judgment motion results in an amended judgment, the separate-document rule applies to the amended judgment); *Employers Ins. of Wausau v. Titan Int'l, Inc.*, 400 F.3d 486, 489 (7th Cir. 2005) (when a post-judgment motion is granted, and

7

therefore produces an amended judgment, the amended judgment must be set forth on a separate document).[3]

Since the February 17 Order was subject to the separate-order requirement of Rule 58, we next ask whether it complied with Rule 58. If it did not, LeBoon's appeal is timely, because she filed a notice of appeal within 180 days from the docketing of the inadequate order.

No magic words are necessary to satisfy the separate document rule; for instance, an "order's denomination as an 'order,' rather than a 'judgment,' does not mean that it fails to satisfy the separate document requirement.*" Local Union No. 1992, IBEW v. Okonite Co.*, 358 F.3d 278, 285 (3d Cir. 2004). Rather, an order is treated as a separate document if it satisfies three criteria: (1) it must be self-contained and separate from the opinion, (2) it must note the relief granted, and (3) it must omit (or at least substantially omit) the trial court's reasons for disposing of the claims. *Id.*; *In re Cendant Corp. Securities Litig.*, 454 F.3d 235, 241 (3d Cir. 2006).

The February 17 Order easily satisfies the second and third criteria.[4] Because it is not "self-contained and separate from the opinion," however, it does not satisfy the first. In *Cendant*, we explained that although the separate-document requirement does not mean that the judgment must necessarily

---

[3] The LJCC concedes this. LeBoon, inexplicably, contests it.

[4] The February 17 Order reads:

    a. Plaintiff's Motion for Summary Judgment is DENIED;
    b. Defendant's Motion for Summary Judgment is GRANTED with regard to Plaintiff's Claims under 42 U.S.C. § 2000(e);
    c. This case is ORDERED DISMISSED for lack of federal jurisdiction. JUDGMENT IS ENTERED in this case in favor of Defendant. The Clerk of Court is hereby directed to close this case for statistical purposes.

be distinct from another document, it means "the judgment must be set forth in a document that is independent of the court's opinion or decision, regardless whether that opinion takes written form." *Id*. at 242. To be independent of the court's opinion, an order must be separately titled and captioned, not paginated consecutively to the opinion or memorandum, not stapled or otherwise attached to the opinion, and must be docketed separately. *See id.* at 241; *Local Union No. 1992*, 358 F.3d at 284-85. The February 17 Order is set forth in a document titled "ORDER AND OPINION." The document contains only one caption and one signature line and is consecutively paginated throughout. The judgment portion of it appears about three-quarters of the way down page 14 of the 15-page document and is separately headed "ORDER." The entire document was docketed as "OPINION AND ORDER." Thus the order does not satisfy the separate-document rule. Consequently the judgment set forth in it should be considered "entered" under Fed. R. App. P. 4(a)(7)(A)(ii) 150 days after February 17, 2005 (the day it was docketed), and LeBoon had 30 days after that to file her appeal. Fed. R. App. P. 4(a)(1)(A).[5]

The final question regarding the timeliness of LeBoon's appeal is whether she was entitled to the additional 150 days to file an appeal or whether, as the LJCC argues, she lost the protections of the separate-document rule by clearly signaling that she understood the February 17 Order as a final judgment subject to appeal. The LJCC contends that LeBoon waived the application of the separate-document rule by filing a motion for

_____

[5] Although LeBoon's appeal was filed before 150 days had elapsed (and thus before the formal entry of judgment), we are not prevented from entertaining it. *See* Fed. R. App. P. 4(a)(2) ("Filing Before Entry of Judgment. A notice of appeal filed after the court announces a decision or order – but before the entry of the judgment of order – is treated as filed on the date of and after the entry"); Fed. R. App. P. 4(a)(7)(B) ("A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a)(1) does not affect the validity of an appeal from that judgment or order.")

9

reconsideration of the February 17 Order, eventually appealing the order, and by stating at oral argument, through counsel, that she understood the February 17 Order to be the final judgment. We disagree.

It is clear that a litigant can waive the application of the separate-document rule in the sense that she may file a valid appeal without waiting for the lapse of 150 days from the docketing of a faulty judgment, *i.e.*, before the faulty judgment has been formalized by the passage of the time period contemplated by Rule of Appellate Procedure 4(a)(7)(A). *Bankers Trust Co. v. Mallis*, 435 U.S. 381 (1978) (*per curiam*). The LJCC's position, however, is that when a litigant signals that she understands that a final judgment has been filed despite the order's failure to comply with the separate-document rule, she must file an appeal within 30 days of the faulty judgment or lose her ability to appeal altogether. This is a dubious argument. *See United States v. Indrelunas*, 411 U.S. 216, 221-22 (1973) (*per curiam*) (although the Government had clearly signaled its understanding that a stipulation for damages was the final judgment, the separate-document provision must be "mechanically applied in order to avoid new uncertainties as to the date on which a judgment is entered" and therefore the Government's appeal was timely); *Gregson & Assocs. Architects v. Gov't of the Virgin Islands*, 675 F.2d 589 (3d Cir. 1982) (*per curiam*) (holding appeal was timely although the appellant admitted it had understood a faulty judgment to be final); Fed. R. App. P. 4(a) advisory committee notes (2002 amendments) ("[i]n drafting new Rule 4(a)(7)(B) [which provides that appeals filed before the lapse of the 150 days that convert a faulty judgment into a final one are valid], the Committee has been careful to avoid phrases such as 'otherwise timely appeal' that might imply an endorsement" of the rule in a minority of the circuits that appellants who waive the separate-document requirement must file an appeal within 30 days of the entry of the "faulty" judgment).

Even if it were possible to waive the protections of the separate-document rule, LeBoon did not do so here. Waiver is "the intentional relinquishment or abandonment of a known

right." *United States v. Olano*, 507 U.S. 725, 733 (1993). It is all too obvious from LeBoon's pleadings that she was unaware she could avail herself of an additional 150 days because of the formal inadequacy of the February 17 Order. At most, she could have *forfeited* her right, *see id.*; we decline to hold, however, that this court is deprived of jurisdiction over an appeal through a litigant's unknowing forfeiture of the additional time granted her by the Rules of Civil and Appellate Procedure, and find instead that LeBoon's April 4 notice of appeal was timely.[6]

## B. Religious Organization Exemption

The Magistrate Judge granted summary judgment to the LJCC on Leboon's claim of religious discrimination because it found that the LJCC was a "religious organization" exempted from compliance with the religious discrimination provisions of Title VII by Section 702 of the Civil Rights Act of 1964. Leboon argues the LJCC was not a religious organization under

---

[6] Leboon's Notice of Appeal refers only to the Order of March 11, 2005, and not to the February 17 Order. This technical inadequacy, however, does not in itself deprive us of jurisdiction over the appeal from the underlying order on the summary judgment motions. *See Matute v. Procoast Nav. Ltd.*, 928 F.2d 627 (3d Cir. 1991) (although appellant filed notice of appeal from his motion for reconsideration and did not state his intention to appeal from the underlying dismissal, the formally deficient filing did not result in a loss of the right to appeal; it was clear in context that appellant intended to appeal from the underlying order and not simply from the denial of his motion for reconsideration), *overruled on other grounds by Neely v. Club Med Mgmt. Svcs., Inc.*, 63 F.3d 166 (3d Cir. 1995); *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 415 (1st Cir. 2000) (if the post-judgment motion addressed the same issues decided in the underlying judgment and the district court relied on the judgment in ruling on the post-judgment motion, the issues decided in the underlying judgment are properly before the court of appeals, even if the notice of appeal fails to designate the underlying judgment).

the statute at the relevant time because it lacked financial or administrative ties with a synagogue and its nature and purposes were primarily cultural, not religious. The LJCC responds that although some of its activities may have been secular in nature, its Jewish mission and orientation qualified it as a religious organization. We hold that the LJCC was entitled to the protection of Section 702 during the period under scrutiny because its structure and purpose were primarily religious.

Section 702 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 329 (1987). It provides that Title VII "shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).

The statute does not define what constitutes "a religious corporation, association, educational institution, or society"; as the Ninth Circuit Court of Appeals has put it, "[a]ll significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988). Over the years, courts have looked at the following factors: (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational

12

institution, and (9) whether its membership is made up by coreligionists. *See Samford v. Killinger*, 113 F.3d 196 (11th Cir. 1997); *EEOC v. Kamehameha Schools / Bishop Estate*, 990 F.2d 458 (9th Cir. 1993); *Townley*, 859 F.2d at 618-19 (9th Cir. 1988); *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980).

It is apparent from the start that the decision whether an organization is "religious" for purposes of the exemption cannot be based on its conformity to some preconceived notion of what a religious organization should do, but must be measured with reference to the particular religion identified by the organization. Thus not all factors will be relevant in all cases, and the weight given each factor may vary from case to case. For instance, although the absence of a proselytizing effort may be a factor under certain circumstances, it will have no significance with a non-proselytizing religion – or thus with a determination whether a Jewish organization is religious. *Cf. Kamehameha*, 990 F.2d at 463 (listing as a factor leading to the conclusion that defendant schools were not entitled to the religious exemption that they had "explicitly disavowed any effort to convert non-Protestant students"). With this caveat in mind we proceed to the analysis.

The LJCC is a non-profit organization. Its Articles of Incorporation and its Bylaws state that its mission is "to enhance and promote Jewish life, identity, and continuity." During the relevant period (defined by LeBoon herself as 1998 to 2002), the walls of the LJCC's lobby carried its mission statement, which was to "develop, involve, and sustain a cohesive Jewish community through identity, education, and cooperation for all ages."

The LJCC's corporate designee testified that the LJCC "espouse[d] Jewish values" although "the Jewish values [it] espouse[d] are universal." These values include "Tikkun olam," meaning healing the world, "Tzadakah," meaning doing the right thing, and "Rachamim," meaning tolerance of other faiths. The LJCC attempted to teach these values in various ways; for instance, a certain charity drive involving the collection of

pennies was described as being "designed to get children involved in tzadakah."

The rabbis from the three local synagogues played an advisory role in the LJCC's management. Under the LJCC's bylaws, they served as honorary, non-voting members of the Board of Trustees. When the LJCC held a retreat in February 2002 to discuss its financial troubles, all three rabbis attended. Minutes of the Executive Committee and Personnel Committee meetings show that Natalie Featherman's contract as Executive Director was not renewed for the reason, among others, that she did not "have the confidence of the leaders of the synagogues and other organizations." The rabbis and presidents of the three local synagogues were involved in the search for a new executive director.

Although the LJCC was financially independent from the local synagogues (as the majority of its budget came from "programming services and rentals"), both the synagogues and local Jewish organizations gave it instrumental financial support. The synagogues assisted with fundraising and the Lancaster Jewish Federation campaign contributed between 15 and 17% of the LJCC's budget annually. The extent to which the LJCC expected to be supported by coreligionists is shown by the fact that it named the different donor levels with Hebrew words. In order to be considered a "Zahav" ("gold")-level donor to the LJCC, a person had to contribute $613 – as many dollars as the commandments in the Hebrew Bible. *See* Cecil Roth, *The Standard Jewish Encyclopedia* 1331 (1959) (entry for "Mitzvah").

While endeavoring not to be identified with any one of the three local synagogues, the LJCC maintained close and active ties with them and other Jewish organizations. The LJCC strove to serve as a "clearing house" for local Jewish people and kept literature from all three area synagogues. Reciprocally, the synagogues distributed the LJCC's information. The synagogues, and particularly the rabbis, also provided programming input and were involved in the LJCC's celebrations of Jewish holidays. One local synagogue,

14

Congregation Shaarai Shomayim, built a Sukkah (a temporary structure used during the holiday of Sukkot) in the LJCC's family park and was involved in a Hanukkah dinner in 1999. The Jewish women's organization Hadassah held its annual Rabbi's Forum at the LJCC at least until 2003, when it decided to hold it at one of the local synagogues because of its deteriorating relationship with Natalie Featherman. In early 2002 the LJCC hosted a meeting of the "Messiah Truth Project," an organization that aims to combat the conversion of Jews to Christianity.

Jewish religious belief played a significant role in the life of the LJCC. In 1998, at Hanukkah, the LJCC's building was rededicated by the rabbis of the three local synagogues, and the rabbis "ceremonially attached [a] mezuzah to the door of the Social Hall." A mezuzah is a scroll inscribed with certain verses from the Torah which the Jews are commanded by the Torah to affix on every doorway. *Standard Jewish Encyclopedia* 1314. The LJCC also observed the Jewish Sabbath and, on at least one occasion, stood by this religious duty against its financial interest – at the end of 2001, despite its financial woes, the Board unanimously decided not to allow a certain organization to rent the facilities for a holiday fair because it did not wish to host a profit-making activity on the Sabbath. Board meetings from 1998 also describe plans for a "Melavveh Malkah," which is the "concluding Sabbath meal." *Standard Jewish Encyclopedia* 1292.

Several of the LJCC's activities involved observance of the Jewish religious calendar, although these activities did not necessarily involve holy services. During the relevant time, Board meetings frequently began with a reading from the Torah related to that week in the Hebrew calendar. The center held events for Sukkot, Purim, Hanukkah, and Yom HaShoah, a holiday in remembrance of the Holocaust, when prayers were said for the dead.

The LJCC kept a kosher kitchen, although non-kosher foods could be brought into the building. In 1999, the LJCC's *mashgiach*, or person in charge of supervising compliance with

15

kosher laws, resigned. It is undisputed that a new *mashgiach* was not hired. However, the LJCC worked with one of the rabbis to create a kosher committee to supervise the kitchen, and attempted to ensure that functions would be kept kosher for the comfort of those who strictly observed the kosher mandate.

To the extent that the LJCC also served as an educational institution, the balance of Jewish, as opposed to other content, in the curriculum was in flux during the period under scrutiny. Indeed, when the new director, Natalie Featherman, was hired, a part of her mandate was to "put[] an emphasis on the Jewish in Jewish Community Center." For instance, Featherman introduced a Judaic curriculum into the preschool program, which had been non-denominational prior to mid-2002, and supplemented it by a parallel enrichment program with a Judaic base.

The LJCC's corporate designee testified that the preschool held "Tot-Shabbat," a weekly celebration of the Sabbath for toddlers, involving the distribution of challah (a traditional bread) and the recitation of blessings. The Notes to the Financial Statements for 2001 and 2002 state that "[i]n keeping with the philosophy of the Jewish Community Center, [the preschool] integrate[d] the Jewish holidays as they [arose] throughout the year. [It] also explore[d] multicultural themes and each child's unique cultural background."

Judaic programming was available for adults through the Holocaust Memorial Library and Center for Diversity and Tolerance Education. The Center also held Beit Midrash (study hall) meetings with rabbis and other Jewish educators. In 1999, the LJCC ran a program called "Jewish U," a Jewish education series. The record does not clarify the content of this series. For a time, the B'nai B'rith Youth Organization, a world-wide organization for Jewish teens, met at the LJCC. It stopped doing so when the group's advisor resigned from the position.

To summarize, the LJCC saw itself as a center for the local Jewish community, identified itself as Jewish through the mezuzah on its doorway, relied on coreligionists for financial

16

support, and offered instructional programs with a Jewish content. The Jewish religious calendar provided the rhythm for the LJCC's yearly (and even weekly) activities; the three area rabbis were involved in management decisions, including the search for an executive director; and the Board of Trustees began meetings with Biblical readings and remained acutely conscious of the Jewish character of the organization. These characteristics of the LJCC, taken together, clearly point to the conclusion that the LJCC was primarily a religious organization.

LeBoon argues that despite all this the LJCC is not sufficiently religious to qualify for Section 702 protection. She points out that it engaged in secular activities, such as lectures and instructions with no religious content, and once even rented space to a Hindu group for meetings , that its employees were overwhelmingly Gentile, that it accepted United Way funds with the promise that it would not discriminate in the funded programs, and that it failed to ban non-kosher foods. None of these factors is decisive.

First, religious organizations may engage in secular activities without forfeiting protection under Section 702. *See Hall v. Baptist Memorial Care Corp.*, 215 F.3d 618 (6th Cir. 2000) (where a college has clear religious overtones, the fact that it trains its students for health care, a secular activity, does not deprive it of Section 702 protection); *Feldstein v. Christian Science Monitor*, 555 F. Supp. 974, 977-78 (D.Mass.1983) (a newspaper with a close relationship with the Christian Science Church was allowed to discriminate in favor of co-religionists although it held itself out as an objective and unbiased reporter of world news). Of course the religious organization exemption would not extend to an enterprise involved in a wholly secular and for-profit activity. *See Townley,* 859 F.2d at 610 (declining to extend Section 702 protection to a corporation manufacturing industrial equipment that claimed a religious exemption on the basis of its owners' intent to pervade the activity with their religious belief).

Second, religious organizations need not adhere absolutely to the strictest tenets of their faiths to qualify for

Section 702 protection. *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds"); *Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 715-16 (1981) (declining to hold that a certain individual's belief was not "religious" for purposes of a free exercise claim because there existed interfaith differences of interpretation). For example here, the LJCC's tolerance of non-kosher foods on its premises is balanced by its continued attempt to maintain a kosher kitchen.

Third, religious organizations may declare their intention not to discriminate, as the LJCC did to the United Way and in its employee handbook, without losing the protection of Section 702. *See Hall*, 215 F.3d at 625 (Section 702 exemption could not be waived, even if the entity invoking it had "represented itself as being an equal opportunity employer and . . . received federal funds").

Fourth, the organization need not enforce an across-the-board policy of hiring only coreligionists. *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *Samford v. Killinger*, 113 F.3d 196, 199-200 (11th Cir. 1997) (no need for an educational institution to engage in a "strict policy of religious discrimination" to be entitled to the exemption).

We disagree with LeBoon's contention that the LJCC's willingness to welcome Gentile members and even to host Hindu services is incompatible with the view that the LJCC was a religious organization. Indeed, these characteristics are clearly tied to some of the Jewish principles that guided the LJCC – tolerance toward other faiths, healing the world, and doing the right thing.[7] We will not deprive the LJCC of the protection of

---

[7] Although the LJCC itself acknowledges that some of these principles exist outside Judaism, to the extent that the LJCC followed them as Jewish principles this does not make them any less significant.

Section 702 because it sought to abide by its principles of "tolerance" and "healing the world" through extending its welcome to non-Jews.

We also decline LeBoon's invitation to hold that the LJCC is a center for Jewish culture rather than religion for the reasons explained by the Magistrate Judge, namely, because to engage in such an analysis would risk precisely the sort of state entanglement with religion that the Supreme Court has repeatedly warned against. *See Amos*, 483 U.S. at 343 (Brennan, J., concurring) (noting that the determination whether a particular activity of a religious organization is religious or secular "results in considerable ongoing government entanglement in religious affairs"); *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971); *Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 04-cv-430, 2005 WL 387642 at \*3 n.3(E.D. Pa. Feb. 17, 2005)**.**

Finally, we are not persuaded by the Ninth Circuit Court of Appeals' suggestion, on the basis of legislative history, that Section 702 should be understood to cover little more than formal houses of worship. *Townley*, 859 F.2d at 618. The court based this assertion on one of the congressional debates that led to the passage of the Civil Rights Act of 1964, which it summarized as follows:

> In 1963, the House Judiciary Committee drafted H.R. 7152, the bill which was the basis of much of the Civil Rights Act of 1964. Title VII of the bill included a section that stated the title would not apply to a "religious corporation, association, or society." . . . [During the House debate] Representative Purcell proposed amending H.R. 7152 to allow an educational institution to discriminate on the basis of religion if the institution was wholly or partly supported or managed "by a particular religion or by a particular religious corporation, association, or society," or if the institution's curriculum was directed toward the propagation of a particular

19

religion. *EEOC Legislative History of Titles VII and XII of the Civil Rights Act of 1964*, at 3197 (1968). . . .

[A]n issue in the debate was whether such institutions were already protected by the "religious corporation" exemption. The consensus was that they were not protected if they were merely "affiliated" with a religious organization. . . .

Congress's conception of the scope of section 702 was not a broad one. All assumed that only those institutions with extremely close ties to organized religions would be covered. Churches, and entities similar to churches, were the paradigm.

*Townley*, 859 F.2d at 617-18.

The amendment was introduced and eventually approved. We do not, however, believe that this one bit of legislative history supports the assertion in *Townley* that Congress assumed only "[c]hurches, and entities similar to churches" would be protected by the "religious corporation, association, and society" language (*i.e.*, by what is now Section 702) without the proposed amendment to the bill. *Id.* at 618. First, as *Townley* itself acknowledges, "[the] debate is far from comprehensive," and although some congressmen expressed concern that the courts would interpret the existing "religious corporation, association, or society" language narrowly and not extend the exemption to religiously affiliated colleges and schools, the perception that the language was insufficient was hardly unanimous. Indeed, the discussion was so far from enlightening on the intended beneficiaries of the protection as to prompt one Congressman to comment that "if there ever was a legislative history which became confused in less than an hour, this is it. . . . [E]very shade of opinion has been ventured on this language which is conceivable." *EEOC Legislative History* at 3204. Second, the debaters' concern overwhelmingly regarded the

ability of a *secular* educational institution teaching *secular* subjects, but affiliated with or owned by a religious order or organization, to hire preferentially persons of the same faith. *See, e.g.*, *EEOC Legislative History* at 3199 (Ouachita Baptist College), 3202 (Catholic colleges and schools). It is a large leap from acknowledging this concern, whether or not well-founded, to concluding that the Congressmen believed the existing bill to protect virtually nothing beyond formal houses of worship. In fact, the concern expressed during the debate is largely irrelevant to the question we face today, since the LJCC is readily distinguishable from the examples of schools and colleges that pepper the transcript. The LJCC's main purpose was to "enhance and promote Jewish life, identity, and continuity," not to teach calculus or chemistry, whether or not in a religious atmosphere. Thus we do not find the legislative history helpful and decline to follow the conclusion drawn from it in *Townley*.

Because, during the period under consideration, the LJCC's primary purpose was religious, we will affirm the District Court's dismissal of LeBoon's claim of religious discrimination.

### C. Retaliation Claim

LeBoon argues the Magistrate Judge erred in granting summary judgment for the LJCC on her claim of retaliation under Title VII. The Magistrate Judge held that although LeBoon's evidence, considered in the light most favorable to her, supported the conclusion that she had opposed conduct by the LJCC that she believed to be unlawful discrimination, she had not produced enough evidence to allow a reasonable fact-finder to find that she was fired because of her complaints. LeBoon contends that she has produced sufficient evidence of a causal connection. We agree with the Magistrate Judge that LeBoon cannot survive summary judgment on her claim of retaliation.

To establish a prima facie case of retaliation under Title VII, a  plaintiff must show that (1) she engaged in protected

21

activity, (2) the employer took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the employer's action. *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006).[8]

LeBoon clearly suffered a materially adverse action, since she was terminated from her job. She has also proffered evidence that she engaged in activity protected by Title VII (namely, coworker Deborah Brown's affidavit that she witnessed LeBoon complaining to Featherman, at the end of May, 2002, that a certain African-American employee had been terminated because of her race).[9] The question is whether

_____

[8] In order to show that she was terminated because of her complaints about the firing of her coworkers, LeBoon need not prove that retaliation was the *sole* reason for the LJCC's decision; she must prove, however, that it was a *determinative factor* of the employment decision, meaning that she would not have been terminated but for her protected activity. *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir. 2000); *Caver v. City of Trenton*, 420 F.3d 243, 267 (3d Cir. 2005).

[9] Protected activity for purposes of a prima facie case of retaliation does not mean a formal action against the employer. "Opposition" to discrimination under the retaliation provision "can take the form of informal protests of discriminatory employment practices, including making complaints to management." *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir.2006) (internal citation and quotation marks omitted.) In addition, the plaintiff making a retaliation claim need not prove the merits of the underlying discrimination complaint, but only that a reasonable person in these circumstances would have concluded that the employer was engaging in discriminatory conduct. *Id.* at 344. Here, LeBoon's belief was not clearly unreasonable, although the terminated co-worker had taken an unauthorized day off immediately before being fired.

LeBoon also claims that she complained to Featherman and others about six months before her termination about the firing of an employee who may have had a speech impediment,

22

LeBoon has placed enough evidence in the record to create a genuine issue of material fact as to whether there was a causal link between her complaints and her termination. We hold that she has not.

LeBoon argues that the causal link is established by the temporal proximity of her complaint to her termination (three months) and by several episodes in the intervening periods that show that her relationship with Featherman deteriorated after her complaint. The LJCC disagrees.

We consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). Where the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (temporal proximity alone, when "very close," can in some instances establish a prima facie case of retaliation); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment in favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim). Where the temporal proximity is not "unusually suggestive," we ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell*, 206 F.3d at 280 (internal citation and quotation marks omitted). Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id.* at 279-81. *See also*

---

custodian Troy Rollman. There is no support for this in the record beyond LeBoon's own testimony; in any event, any claim of retaliation based on this alleged complaint would fail for the same reasons as the claim related to the termination of LeBoon's African-American coworker.

23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment. *See Clark County School Dist.* 532 U.S. at 273 (citing favorably *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997), which rejected such an inference where the events were three months apart); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five-month time period between employee's complaint and first adverse action was, without additional evidence, insufficient to raise an inference of causation). Thus we ask whether there is sufficient evidence in the record for a reasonable fact-finder to determine that LeBoon's termination was caused by her complaint about the termination of her coworker.

LeBoon has presented evidence of her strained relationship with Featherman during the last several months of her employment. It is undisputed, however, that LeBoon started having difficulties with Featherman almost immediately upon Featherman's appointment as Executive Director. In January, 2002, she expressed her disagreement with the LJCC's hosting of a Messiah Truth Project meeting; in February, she complained to Featherman about accounting irregularities (and also reported them to a Pennsylvania hotline); also in February, she was relieved of the facility management aspects of her position; in April or May, 2002, the security of the business office, for which LeBoon was responsible, was compromised, and as a result LeBoon established a home office; LeBoon and Featherman disagreed as to whether Featherman authorized this. In May, LeBoon reported to the Board Featherman's decision to offer another employee, Stefan Dabrowski, additional compensation in the form of a "reimbursement" of the health insurance premium that the LJCC did not have to pay because he had opted out of insurance, and also Featherman's backdating

24

of a memo to the personnel file about this decision. Featherman was forced to explain herself to the Board in a memorandum. Also in May, the Joint Personnel Committee sent a memorandum to the Board expressing its concern with Featherman's actions, several of which were reported by LeBoon. The memorandum memorializes another instance of conflict between Featherman and LeBoon, arising from LeBoon's request that Featherman formalize a reprimand to another employee. Again in the same month, the LJCC received payment of a grant meant for an elevator in response to invoices sent by Featherman, and LeBoon called the grantor to state the elevator work had not yet begun. The grantor wrote Featherman to return the money on June 3, only a few days after LeBoon's African-American coworker was terminated; LeBoon testified that Featherman must have known LeBoon had caused the request for the grant to be returned.

None of the events after LeBoon's complaint about the termination of her coworker in late May, 2002, show a qualitatively different relationship between LeBoon and Featherman. The record includes evidence that Featherman asked LeBoon to report to Dabroski rather than directly to her (a change which, according to LeBoon herself, was in response to her insistence on reporting Featherman's irregularities to the Board); that LeBoon again complained to an official of the LJCC about an irregularity involving an employee's time sheets, which caused Featherman to tell LeBoon to stop "snooping around her employees"; and that, two weeks before being fired, LeBoon wrote a memo to Featherman recording her compliance with Featherman's request that Dabrowski be paid as yet unearned vacation pay. The record also shows that another employee, Deborah Brown, resigned in June, explaining in her letter of resignation that Featherman had told Brown she could no longer trust her because Brown reported her grievances regarding Featherman to the Personnel Committee.

Thus, although the evidence in the record clearly shows a tense relationship between LeBoon and Featherman, it does not sustain the inference that it was caused by LeBoon's protected activity. Rather, there is a clear pattern of LeBoon's

complaining to Board members about Featherman or insisting on respect for formalities and Featherman's displeasure at these reports and limitations on her authority even before any mention of possible discriminatory conduct on the part of the LJCC; there are also clear indications that LeBoon was not the only person who suffered the consequences of complaining to the Board about Featherman.

LeBoon argues that she can show causation because of inconsistencies in the LJCC's explanations for her termination.[10] She contends that the LJCC did not save any money by terminating her, since it paid those who took over her tasks more than it saved.

There can be no serious dispute that the LJCC was in dire financial straits during the relevant period. The Board minutes reflect an increasing preoccupation with the LJCC's chances of survival; at the Board meeting held four days before LeBoon's termination, the treasurer reported the LJCC did not "have enough to get through another month," and the possibility of declaring bankruptcy was considered. As to the redistribution of LeBoon's duties, after LeBoon's termination the bookkeeping was done by Featherman, Dabroski, and some volunteers; it was not until the merger creating the Jewish Alliance of Lancaster that two different employees took over the duties that had been LeBoon's. Although financial difficulties in themselves do not explain why LeBoon in particular was fired, the LJCC's explanation is not so inconsistent or incongruous, in the absence of any other evidence, as to give rise to an inference that LeBoon was terminated because of her protected activity.

_____

[10] Although an examination of the employer's proffered legitimate reason for the adverse action is frequently delayed until the second and third parts of the familiar *McDonnell Douglas* burden-shifting framework in pretext cases, "evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Farrell*, 206 F.3d at 286.

We agree with the District Court that no reasonable jury could find that LeBoon's termination was caused by her complaint about the termination of an African-American coworker, and will affirm the grant of summary judgment on LeBoon's retaliation claim.

### D. The District Court's Denial of LeBoon's Motion to Reopen Discovery

The final question before us is whether the District Court erred by denying LeBoon's motion to reopen discovery to allow the deposition of David Goodman, a person affiliated with the Messiah Truth Project, after he had been located.

A district court's denial of discovery is reviewed for abuse of discretion. *United States v. Hedaithy*, 392 F.3d 580, 605 (3d Cir. 2004). Here, LeBoon moved to reopen discovery in February, 2005, over two months after the close of discovery. At the time of her motion, LeBoon had filed a motion for summary judgment, indicating that, from her perspective, the record was sufficient to warrant relief in her favor. *See Bencivenga v. Western Pa. Teamsters & Employees*, 763 F.2d 574, 576 (3d Cir. 1985). In addition, she did not file an affidavit indicating that she needed additional discovery to respond to the LJCC's motion for summary judgment, as provided under Federal Rule of Civil Procedure 56(f). *See Radich v. Goode*, 886 F.2d 1391 (3d Cir. 1989) (district court did not abuse discretion by granting summary judgment despite appellant's contention that more discovery was needed when appellant failed to comply with Rule 56(f) and specify with particularity what discovery was needed). We conclude, therefore, that the Magistrate Judge did not abuse his discretion in denying LeBoon's motion.

## IV. Conclusion

For the reasons stated above, we will affirm the District Court's order denying LeBoon's motion for summary judgment and granting summary judgment to the Lancaster Jewish Community Center.

**LeBoon v. Lancaster Jewish Community Center Assoc.,**

**05-2073**

RENDELL, *Circuit Judge*, dissenting.

This case presents an issue of statutory interpretation. As the majority points out, Title VII "does not define what constitutes 'a religious corporation, association, educational institution, or society.'" Maj. Op. at 12. Our task, therefore, is to determine what Congress meant when it employed those words and provided that the hiring and firing decisions of such entities should be immune from suits alleging discrimination on the basis of religion. Rather than inquire into Congress's intent, however, the majority refers with broad brush to the approaches taken by other courts, fails to give serious consideration to the relevant legislative history, and embraces a hybrid-scattershot test that examines whether the Lancaster Jewish Community Center ("LJCC") kept a kosher kitchen, affixed a mezuzah to its doorway or recorded its board meetings using the Hebrew calendar. From the particulars of the LJCC's operation, the majority concludes that the LJCC is Jewish enough to qualify as a "religious corporation."

I suggest that the majority's analysis and ultimate ruling disregard basic canons of statutory interpretation, invite ill-advised judicial forays into the minutiae of private religious practice and, worst of all, sanction discriminatory employment decisions that go far beyond those Congress intended to exempt from Title VII. Therefore, I must respectfully dissent from this aspect of the majority's opinion.[11]

---

[11]I do not disagree with the majority's rulings with respect to parts I, II.A, II.C and II.D.

# I.

We come to this issue *tabula rasa*. As I noted above, Congress did not include within Title VII a definition of the term "religious corporation." *See* Maj. Op. at 19-21. Nor have we yet had occasion to consider the meaning of that phrase. Indeed, a survey of our sister courts of appeals reveals that "[t]here is little precedent on the meaning of 'religious corporation' under [§ 702(a)]." *Fike v. United Methodist Children's Home of Va., Inc.*, 547 F. Supp. 286, 290 (E.D. Va. 1982); *see also EEOC v. Townley Eng'g & Mfg. Corp.*, 859 F.2d 610, 618 (9th Cir. 1988) (noting that "the case law on this question is not very helpful"). Nevertheless, this lack of authority does not diminish our responsibility to interpret "religious corporation" in a way that "give[s] effect to Congress's intent." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001).

It is axiomatic that, when the meaning of a phrase employed by Congress is undefined and unclear, we must begin our efforts to determine its meaning with a review of the relevant legislative history. "The Supreme Court has repeatedly stated: 'Where . . . the resolution of a question of federal law turns on a statute and the intention of Congress, we first look to the statutory language and then to the legislative history if the statutory language is unclear.'" *Murphy v. Dalton*, 81 F.3d 343, 350 (3d Cir. 1996) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 (1984)); *see also United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000) ("Where the statutory language does not express Congress's intent unequivocally, a court traditionally refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose."); *Dir., Office of Workers' Comp. Programs v. Sun Ship, Inc.*, 150 F.3d 288, 291 (3d Cir. 1998) ("If the statutory language is ambiguous, we look to legislative history to determine congressional intent."). The majority fails to take even this most basic step, referring in conclusory fashion to the analysis of the legislative history supplied by another court. Maj. Op. at 19-21. A thorough analysis of the legislative history makes clear that Congress intended the phrase "religious

corporation" to mean those organizations funded or controlled by a religious group.

## II.

The current version of Title VII includes two exemptions pertinent to this case. The first is located in § 702(a) and provides that the anti-discrimination provisions of Title VII "shall not apply . . . to a religious corporation, association, educational institution, or society." The second is located in § 703(e)(2) and provides that

> it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

While Title VII's drafters included the § 702(a) exception in the first draft of H.R. 7152 – "the bill which was the basis of much of the Civil Rights Act of 1964," *Townley*, 859 F.2d at 617 – they did not include the § 703(e)(2) exception. Fearing that § 702(a) would not include situations in which an educational institution had aligned itself with a particular faith, but was *not* fully owned or supported by that faith, Representative Graham Purcell offered an amendment that would create the exception now located in § 703(e)(2). At issue in the floor debate over the Purcell Amendment was whether it was necessary – that is, whether the exemption located under § 702(a) was already sufficient to cover the relationships of concern to Rep. Purcell. Or course, Rep.

30

Purcell believed that it was not and, in support of his argument, said:

> In my study of the bill, I discovered that generally the church-affiliated schools and colleges that are not protected by these two attempts to exempt them.

> Almost without exception, the term "religious corporation" would not include church-affiliated schools unless this definition should received the most liberal possible interpretation by the courts. Actually most church-related schools are chartered under the general corporation statutes as nonprofit institutions for the purpose of education.

*EEOC Legislative History of Titles VII and XI of the Civil Rights Act of 1964*, at 3197 (1968) (emphasis added).[12]

Later in the debate, Representative Herbert Ray Roberts rose to inquire about the status of a religious orphanage in his district and whether it would be considered exempt under § 702(a). In response, Representative Franklin Delano Roosevelt, Jr. rose and asked whether "the organization . . . [was] *wholly owned* by [the] religious order." *Id.* at 3201 (emphasis added). When Representative Roberts responded that it was, Representative Roosevelt said that it would "unquestionably" be exempt under § 702(a). *Id.* Representative Roberts rose once again to inquire about the same orphanage

---

[12]Notably, the LJCC has represented itself as an "educational organization" before the Internal Revenue Service, *see* Appx. at 1058, and as an entity created "[t]o provide educational, recreational, social, cultural, and human services to all members of the community," before the Commonwealth of Pennsylvania Department of State, *see id.* at 1080.

and, in response, Representative Emanuel Celler, then Chairman of the Judiciary Committee and instrumental in the drafting and passage of the Civil Rights Act, rose to say that the orphanage would fall under § 702(a) "[i]f it [was] a *wholly church supported* organization, that is, a religious corporation that comes under section [702(a)]." *Id.* at 3204 (emphasis added). In short, "the consensus was that [religious corporations] were not protected [under § 702(a)] if they were merely 'affiliated' with a religious organization." *Townley*, 859 F.2d at 617.

Eventually, Congress passed the Purcell Amendment, confirming that it understood the § 703(e)(2) exemption to require a lesser degree of association between an entity and a religious sect than what would be required under § 702(a). This is made all the more obvious by the fact that, since § 702(a) already exempted religious "educational institution[s]," there would have been no need to create an entirely new section if Congress had already intended § 702(a) to encompass relationships in which schools or colleges were not actually owned or controlled by a formal religious organization. Therefore, the distinction between § 702(a) and § 703(e)(2) is that the former requires an extremely close nexus between the entity and the religion while the latter requires a lesser showing. *See, e.g.*, *Fike*, 547 F. Supp. at 290 n.3 (describing the § 703(e)(2) exemption as the "more lenient exemption" of the two). Thus, § 703(e)(2) applies only to an entity that is "in whole or in substantial part, owned, supported, controlled or managed by a particular religion," while § 702(a) requires a showing that the entity *is more than* "in substantial part, owned, supported, controlled or managed by a particular religion." This leaves very little room for an organization financially or structurally independent of a religious order to avail itself of the § 702(a) exemption.

Looking at the LJCC through this lens, there is no doubt that it does not qualify under § 702(a). With respect to governance, the LJCC, during the relevant time period, was not run by a synagogue, but by a board independently elected by the Center's members. As the majority points out, while the rabbis

from each of the three local synagogues attended board meetings, they only "played an advisory role," serving as "honorary, non-voting members" of the Board. Maj Op. at 14. With respect to financial assistance, there is simply no evidence, nor has the LJCC contended, that any of the local synagogues gave the LJCC any money in any of the years at issue. Instead, the LJCC sustained itself largely by dues and income from the rental of its facilities. The only support it received from an arguably "religious" organization was, as the majority points out, from the Lancaster Jewish Federation. *See id.* The LJCC does not argue that the Federation was akin to a synagogue. Therefore, far from being more than "in substantial part, owned, supported, controlled or managed by a particular religion," the LJCC was an independent entity not controlled by any religious sect while it employed Linda LeBoon and cannot now use § 702(a) to shield itself from LeBoon's suit.

**III.**

The majority's discussion of the legislative history misses the point, as it fails to address the concern of the debaters that is relevant to the question before us – namely, the relationship required between an organization and its religion under §§ 702(a) & 703(e)(2). Instead, the majority notes that the representatives were concerned with "the ability of a *secular* educational institution teaching *secular* subjects, but affiliated with or owned by a religious order or organization, to hire preferentially persons of the same faith." Maj. Op. at 20-21. While the purpose of the *amendment* was, undoubtedly, to address the ability of religious schools to hire and fire preferentially, the *debate* explored the extent to which that had already been achieved by § 702(a), and it is this feature of the debate that sheds light on the meaning of that exemption.

Additionally, the majority writes that "the LJCC is readily distinguishable from the examples of schools and colleges that pepper the transcript" of the legislative history. Maj. Op. at 21. The question of whether the LJCC is "readily distinguishable" from the schools and colleges discussed in the

debate is irrelevant because the question is not at issue.[13]  What is important for our purposes is that the legislative history reveals what Congress understood to be the differences between the relevant exemptions, both of which refer to religious schools and colleges.  The discussion of whether § 702(a) was sufficient to cover independent religious schools informs the meaning of "religious corporation" since § 702(a) treated both entities in the same way.

The majority's terse discussion of the legislative history robs its analysis of the necessary focus on Congress's intent and consequently infects its ability to craft a coherent and manageable test for determining what constitutes a "religious corporation, association, educational institution, or society." Rather than adopting an approach that analyzes the closeness of the LJCC's formal relationship with a particular religious group, the majority announces at the outset of its discussion that the LJCC is entitled to the § 702(a) exemption "because its structure and purpose" are primarily religious.  However, it then proceeds to discuss neither structure nor purpose, but, rather, catalogues Jewish attributes of the LJCC's daily operations, such as the features of the its programming, its observance of the Sabbath, its pre-school curriculum and the extent to which the Jewish calendar "provided the rhythm" of its activities. Maj. Op. at 17.  As if this approach were not already sufficiently nebulous, the majority offers a series of caveats, which dictate that a religious corporation may avail itself of § 702(a) and still "engage in secular activities," fail to conform to "the strictest tenets" of its faith, declare its intention not to discriminate even while doing just that, and, finally, hire persons who subscribe to other faiths while reserving the right to fire those same employees, solely on the basis of their religion, should it choose to do so at some point in the future. Maj. Op. at 17-18.

---

[13]The question would have been relevant had the LJCC sought protection under the § 703(e)(2) exemption, which it did not.

34

The majority's test is unwieldy and rooted in neither the text of Title VII nor in the understanding of the Congress that wrote it.

## IV.

In sum, Congress understood § 702(a) to cover only those entities that, unlike the LJCC, are controlled by a religious sect. *See Townley*, 859 F.2d at 617 ("All assumed that only those institutions with extremely close ties to organized religion would be covered [by § 702(a)]. Churches, and entities similar to churches, were the paradigm."). However, another serious concern cuts in favor of reading § 702(a) as I suggest, and that is, as even the majority points out, that "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" Maj. Op. at 18 (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)). Unfortunately, this is exactly the sort of scrutiny that the majority applies to the LJCC, giving us a five-page analysis of the particulars of the Center's commitment to Judaism – an analysis exemplified by its pronouncement that "the LJCC's tolerance of non-kosher foods on its premises is balanced by its continued attempt to maintain a kosher kitchen." *Id.* By adopting a test that turns on the attributes of the LJCC's religious practice, the majority mistakenly assumes that we have the competence to, and should, sort through the various activities of a religiously inclined organization and pick out those that are meaningful and those that are not. We have previously declined to do so. *See Africa v. Pennsylvania*, 662 F.3d 1025, 1030 (3d Cir. 1981) ("Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy."); *see also DeHart v. Horn*, 227 F.3d 47, 55-57 (3d Cir. 2000) (citing many cases establishing "a consistent and resounding theme" that represents our, and the Supreme Court's, reluctance to evaluate the particulars of religious practice). We should not do so here. It is neither practical nor desirable and, ultimately, unnecessary given Congress's intent.

## V.

For these reasons, I would reverse the District Court's order and remand for further proceedings on LeBoon's discrimination claim.